Joel **MEYERS** et al.,

v.

Noah **ALLDREDGE**, Warden, United States Penitentiary at Lewisburg, Pennsylvania, et al.

Civ. No. 72–132.

United States District Court, M. D. Pennsylvania.

June 16, 1972.

As Amended June 26, 1972.

Thomas Harvey, Ambrose Campana,
American Civil Liberties Union of Pa.,

Williamsport, Pa., for Prison Solidarity Committee.

Leonard Kolleeny, New York City, Herman Schwartz, Buffalo, N. Y., Michele Hermann, Prisoners' Rights Project–American Civil Liberties Union Foundation, New York City, for plaintiffs.

Julius Altman, Asst. U. S. Atty., Scranton, Pa., Clair Cripe, Bureau of Prisons Legal Office, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEALON, District Judge.

Plaintiffs commenced this suit on behalf of themselves and all inmates at the United States Penitentiary, Lewisburg, Pennsylvania, in which they challenge the constitutionality of conditions and practices at the Penitentiary following an inmate work stoppage in February, 1972.[1] The plaintiffs advanced the following contentions: (1) the actions of the administration were so fundamentally unfair and the charges against the plaintiffs and their class so fundamentally untrue as to constitute a violation of substantive due process; (2) the disciplinary procedures afforded plaintiffs and their class were so inadequate that they failed to comply with procedural due process; and (3) the punishments inflicted upon plaintiffs and their class were so harsh and disproportionate to the alleged infractions as to constitute cruel and unusual punishment. Evidence was presented and testimony taken on March 29, 30, and May 12, 15, 1972. A briefing schedule was established and final reply briefs were filed May 26, 1972.

A review of the evidence is necessary to place the issues in their proper perspective.

On the morning of Tuesday, February 15, 1972, at approximately 9:00 A.M. at the United States Penitentiary, Lewisburg, Pennsylvania, rumors reached prison officials that an inmate work stoppage was scheduled to take place that afternoon in the Prison Industry Section. At 12:30 P.M., after inmates were returning to their work assignments following the noon meal, between 150 and 200 men began milling about in the open area between the Industry building and the Institution warehouse. Captain Paul Dodd, Chief Correctional Supervisor, investigated and, at his behest, an inmate named Saunders climbed up on the loading platform and inquired as to what the men were doing out there. At this point, plaintiff Ronald Phillips ascended the platform and read from a three-sheet document entitled "United Prisoners Bill of Rights". He was followed by plaintiff William Irwin who complained, admittedly in an emotional manner, about the prisoners being "robbed", "wages being withheld", "that those who withheld their wages are criminals and should be in jail", and about the unfairness of the Parole Board. The crowd reacted in kind and some raised their fists shouting "right on". Plaintiff Clarence Jones also expressed himself briefly as did two other inmates, Hartwell and Humphrey. There were between ten to fifteen inmates on the platform, including plaintiff Joel Meyers, who in addition to making a speech, was observed carrying "quite a bit of paper, whispering and passing the paper around", and plaintiff John Alger, although Alger did not address the crowd and there was no testimony as to his conduct at that time. This activity lasted for almost an hour and, when it began to snow, Captain Dodd suggested that the inmates move inside to the Auditorium where they could meet and attempt to prepare a list of grievances which he, in turn, would submit to his superior. He stressed that they remain non-violent and stated that there would be "no reprisals because of this incident". The inmates then moved into the Auditorium where they remained until 3:30 P.M. and during which time a committee of nine inmates (3 white, 3 black and 3 Spanish-speaking) was created to meet with the

---

1. Jurisdiction is invoked under 28 U.S.C. § 1331(a) and 28 U.S.C. § 1361.

Administration at 6:30 P.M. that evening. In the meantime, at approximately 2:00 P.M., the Administration announced that all inmates in the shops, warehouse and remaining industries were to be allowed to leave if they desired, and at 2:30 P.M., all had left. There was also a walkout by part of the food service detail necessitating staff employees being placed in the kitchen to complete preparation of the evening meal. At 5:00 P.M. prison officials felt that tension was mounting and a large number of inmates were milling around the "Red Top", the center portion of the main corridor in front of the Dining Room, into which all other corridors feed. The scheduled meeting at 6:30 P.M. did not materialize because many inmates complained that the 9-man grievance committee had not been properly selected and was not representative of the prison population. At the request of inmate John Wagner, Associate Editor of the Prison Digest International, another prisoner meeting was scheduled in the Auditorium; Deputy Warden George L. Cansler having announced over the public address system that the inmates had until 8:30 P.M. to elect a committee of 8 to 12 men, and the administration would then meet with this committee. The meeting was concluded prior to 8:00 P.M. and a negotiating committee of 16 was elected with plaintiff William Irwin as Chairman, and plaintiffs Joel Meyers, Ronald Phillips, Clarence Jones, Lucky Johnson, Edward Mason, Ronald Tucker, Michel Buyse and John Alger as members of the committee (also known as the first committee). Irwin informed Cansler that because the committee desired to formulate grievances, it could not meet with the administration that evening and, further, that they were shutting down all work activity, except in the hospital. After the inmates returned to their quarters, the administration decided to suspend all activities and to secure the institution by locking all inmates in their housing units. Plans were made to place staff employees in Food Service and, beginning the next morning, to feed one floor of each housing unit at a time. Because of the delay in food preparation and the additional time required to feed the inmates in their quarters, the institution was placed on a two meals per day basis except in segregation where three meals a day were served. There were no threats or acts of violence, although prison officials believed that the rising tension in the institution required prompt action on prisoner grievances.

The following morning, Wednesday, February 16, at 9:00 A.M., correctional officers released the members of the committee and took them to Room 14 of the Education Building where they were allowed to meet. Shortly after 10:00 A.M., Wagner, who was serving as liaison between the committee and the administration, presented a list of five demands which the committee specified would have to be met before they would proceed to anything else. The five demands were: (1) a letter from the Warden recognizing the negotiating committee as such; (2) a letter confirming that there would be no reprisals by officials of the institution against members of the committee; (3) reopening of the visiting room which had been closed; (4) that the committee be allowed to have a legal representative at their meetings, viz., Philip Hinchey of Alexandria, Virginia; and (5) the presence at their meetings of a member of the press. The list of demands also contained the following notation:

"These 5 demand is priority before anything else is start, we will not start meet unles those 5 demand are receive, this demand should be read to the population by P.A. Systhem." (sic)

At 1:00 P.M., Warden Noah Alldredge and members of his staff proceeded to Room 14 and, after going over each demand, informed the committee that all five were rejected. The Warden indicated to the members of the committee that by meeting with them he was, in fact, recognizing them and he stated further that there would be no reprisals so long as they functioned as a committee in good faith and did not commit an illegal act. He implored them to undertake the compiling of grievances

and gave them until 3:00 P.M. to prepare and submit the grievances or else he would disband the committee and attempt to form another one. When the Warden attempted to read a Bureau of Prisons Policy Statement to the committee, one of its members, Walter Scully, leaped to his feet and refused to allow the statement to be read. Scully also emphasized that the five demands would have to be met before the committee would begin to work on grievances. At 3:10 P.M. Cansler returned to Room 14 and, after determining that no grievances were to be submitted, disbanded the committee. At 4:00 P.M. after the committee returned to quarters, Cansler announced over the Public Address System that the committee would not present grievances and had been disbanded. He asked for the formation of a new committee and requested each of the 16 housing units to elect a representative. Eight units responded, from which eight committee members were elected and the administration selected eight representatives from the remaining units, thus constituting a new negotiating committee (also known as the second committee).

The next day, Thursday, February 17, the members of the second committee circulated among the prison population to collect grievances. They encountered resentment from other inmates and, subsequently, requested a meeting with the first committee. Only one member of the first committee, Scully, agreed to meet with them and at the meeting, he berated them and called on them to disband, which they did. At 2:30 P.M., plaintiffs Irwin, Phillips, Alger, Mason, Buyse, and other members of the first committee, viz., Hilty, Wolcott, and Scully, were placed in the S–5 section of segregation.[2] (Meyers had been confined in segregation since February 16th as a result of an altercation in the Dining Room and subsequently, February 19th, plaintiff Jones and inmate Vivero, who were also members of the negotiating committee, were placed in S–5.) Misconduct reports were filed charging plaintiffs with attempting to incite a work stoppage. At this time there were virtually no services within the Institution and regular employees, working 12 to 18 hours per day, had to provide essential services, including cooking, baking, and serving meals.

From Thursday, February 17th, to Tuesday, February 22nd, after receiving information of threatened violence and the taking of hostages, a systematic shakedown of housing units was initiated and 150 weapons were confiscated, such as knives, hatchets and similar instruments. At the same time, staff employees were probing for inmate attitudes in an effort to determine grievances and complaints. During this period essential services continued to be furnished by regular employees and the

2. There are five different stages of segregation: Stage one (S–1), located on the first floor, is the most restricted and contains 14 cells, the dimensions of each being 6 feet by 12 feet. Entry to each cell is through a metal door on which there is a small grill window, and at the opposite end of the cell is a painted window which permits daylight to enter but prevents outsiders from looking in. There are two artificial lights over the door—one of 100–150 watts for use during the day and a 7½ watt bulb which burns at night. Food is served on paper plates and in paper cups. According to the Prison Policy Statement, this stage is to be used for short term stays and showering is to be permitted twice weekly, but exercise is not provided. Inmates in segregation are to receive regular visiting and correspondence privileges as well as reading and writing materials supplied from a portable cart that comes through the unit.

In the higher levels of segregation, more privileges are extended, as follows: Stage 2 (S–2), food is served on a metal tray and, after thirty days of continuous confinement, a minimum of one-hour exercise period each week is allowed; Stage 3 (S–3), radio earphones, tobacco, matches, library books, magazines and newspapers are provided; Stage 4 (S–4) and Stage 5 (S–5), commissary privileges, chair, locker and regular issue shoes are furnished. Stages 2, 3 and 4 are on the third floor while Stage 5 is located on the second floor. All cells are 6 by 14 feet and have outside windows which the occupant can open and close for fresh air.

prisoners remained locked in their housing units except while dining. (It should be noted that February 19th was a Saturday, February 20th was a Sunday, and February 21st was a national holiday.)

On Tuesday, February 22nd, plans were made to attempt to put the Institution back to work on February 23rd and work schedules were posted for shop areas and maintenance details. It was decided, however, that Industry could not be put back on such short notice and Industry employees were to be allowed to go into indoor recreation areas. On February 23rd, all inmates were then released but, at 4:00 P.M., the plan was cancelled and the inmates returned to their units when, according to administration sources, certain inmates in the recreation areas were agitating the men not to return to work. That evening, after I and J honor units, which defense witnesses described as "normally pro-administration", had hesitated about going back to work, a staff committee of four went into these units to determine sentiment and came back with a report that the prisoners desired that the first committee be reactivated and allowed to meet, with observers attending who could inform the prison population whether the committee was honestly interested in presenting grievances. The need for observers was apparently necessitated by the fact that the prison population had received conflicting versions from the Administration and the first committee as to what had occurred in the discussions on February 16th between prison officials and the committee.

Pursuant to this, on February 24th at 11:30 A.M., the eleven members of the first committee confined to segregation and the five members who remained in population met with four observers, two having been selected by I and J units and two by the administration. A very hectic meeting developed as the committee members felt the observers were sent to the meeting by prison officials to cause confusion and disruption and, after several heated exchanges, the committee

asked the observers to leave, and they complied. At 4:00 P.M., a written communication was sent to the Warden requesting that the committee members in segregation be allowed to return to their quarters and, if he so agreed, the committee would meet on a "morning-noon-nightly basis, beginning on/or about 7:00 P.M. tonight, with sincere hopes of bringing this matter toward further positive developments". The Warden denied this request because "I did not consider this a grievance from the population, but just another pre-condition." Later at 8:15 P.M., another communication was forwarded to the Warden requesting an open meeting in the Auditorium, access to the P.A. system, allowing committee members to mingle among the general population and use of the mimeograph machine. The Warden describing the requests as "pre-conditions without even mentioning grievances" rejected all of them. The committee continued to meet until 10:00 P.M., and during most of this period they were bogged down in a dispute as to whether they should continue to refuse to negotiate until the Warden would formally recognize them in writing. One of the Spanish-speaking members of the committee requested the committee to inform the Warden that if he agreed to formally recognize them, they would ask all inmates to return to work immediately. This was voted down whereupon the Spanish-speaking member advised the committee that he would pull all Spanish-speaking inmates out of the work stoppage and, as a result, the proposal was reconsidered and accepted. The committee then adjourned at 10:00 P.M., eleven inmates returning to segregation and five to population.

The following morning, Friday, February 25, the committee reconvened and was apprised by the five inmates in population that the inmates were very upset about the suggestion that they go back to work and the Spanish-speaking inmates, in particular, felt they were being sold out. In addition, the Warden presented the committee with a written

memorandum in which he stated that he was "almost convinced" that they did not intend to submit grievances but continued to furnish "nothing but the same pre-conditions using different words". He advised them that they would be allowed to meet on a daily "round the clock" basis "until you are able to produce some grievances representing the general population". The committee was orally told that the Warden would reply to all submitted grievances within two weeks in the Friday Flier (the prison newspaper); that the grievances would be mailed to sixteen people chosen by the committee, and that a minimum custody inmate would be allowed to go to the town of Lewisburg to see that these letters were properly mailed. According to plaintiffs Alger and Phillips, the committee felt that to submit a written list of grievances to be answered in two weeks in the Friday Flier was no different from writing a complaint letter to the Administration and was just another instance of the administration's ignoring complaints by "throwing them in a drawer". Plaintiffs concede that the committee did not want to prepare grievances until the Warden officially recognized it but, according to plaintiff Irwin, at 2:00 P.M. it was decided by a vote of 13 to 2 to treat the Warden's Policy Statement as "legal recognition of the committee" and work was started on grievances. Committee member Scully told Deputy Warden Cansler that the grievances would be ready by 3:00 P.M. At 4:00 P.M. Cansler entered the meeting room and was advised by Scully that they would be ready in 10 minutes. After waiting 10 minutes, Cansler returned and was told the committee would

be finished in "just a little while". Cansler testified that he observed some unused stencils and "saw nothing in evidence that they were putting grievances together".[3] The committee stated that it wanted another meeting at 7:30 P.M. but Cansler rejected this indicating that the Warden had to inform the Bureau of Prisons before 5:00 P.M. whether the prison would be back in operation on Monday.[4] Scully then apprised Cansler that it would take at least two more hours before they could finish their grievances and Cansler, convinced that this was a stalling tactic to prolong the strike, demanded the list immediately and, when none was forthcoming, he terminated the meeting, dismissed the committee and returned them to segregation. Because of the lack of progress and the building of tensions, Warden Alldredge decided he had to change direction and arrangements were made to send interviewing teams into each housing unit to interview all inmates to ascertain if they were willing to return to work.

On Saturday morning, February 26th, fifteen teams of two men each, interviewed all inmates, approximately 1250, and exhibited a questionnaire which stated, inter alia, that the administration had concluded that the inmate committee had no intention of preparing grievances and that it was in the best interests of all not to continue the situation indefinitely. Each inmate was asked to indicate in writing whether he was willing to return to work with an admonition that a negative answer may be cause for disciplinary action. A substantial majority indicated a willingness to go back to work, but 311 others, including plaintiff Richard Moore[5] and William

---

3. According to Cansler, Scully had informed him that the stencils did not contain grievances, but he did not indicate when this occurred.

4. Cansler testified that he had sufficient reasons to make a change in the promise that the committee would be allowed to meet around the clock but could not disclose his sources. Warden Alldredge similarly testified that he had received information from inmates that grievances

would never be presented as the plan was to organize a union and that all Federal Institutions would go on strike. According to the Warden, he had received sealed letters from some members of the committee containing the same statement.

5. Moore testified that he informed the interviewer that he would "rather talk to a lawyer" and was told that this would be entered as a "no" answer.

McAllester [6] refused to respond affirmatively.

The next day, Sunday, February 27th, the non-complying inmates were either placed in segregation or confined in E and F dormitories.

At 10:00 A.M. on Monday, February 28th, a work call was issued over the P.A. system and 942 inmates returned to work. Later, the housing units were canvassed and it was discovered that 6 men had refused to answer the work call and they were placed in segregation. The situation steadily improved, although information was received that certain hard core groups were advocating the revival of the strike, the taking of hostages, and attempts at sabotage. The segregated inmates remained in that status until Saturday, March 4th, when the inmates in E and F units were interviewed and all but two agreed to return to work; those refusing were continued in segregated status. Plaintiffs filed this lawsuit on March 17, 1972.

## DISCUSSION

 Prior to analyzing the factual issues, we start with the oft-repeated comment of the Supreme Court in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948) that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system". Furthermore, even those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security. Nevertheless, prison officials do not have carte blanche to disregard a prisoner's constitutional rights, even in the name of prison discipline, Owens v. Brierley, 452 F.2d 640, 642 (3rd Cir. 1971), and the courts have not hesitated to entertain actions asserting violations of fundamental rights. Jackson v. Bishop, 404 F.2d 571, 577

(8th Cir. 1968). However, a prisoner has only such rights as can be exercised without impairing the requirements of prison discipline. Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir. 1964). As expressed by our Court of Appeals in Gittlemacker v. Prasse, 428 F.2d 1 (1970):

"To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests. The desire that there be a maximum opportunity for the exercise of rights and privileges may often collide with the practical necessities of managing and administering a complicated penal community. The task of striking the proper balance between these conflicting interests is generally within the competence of the prison authorities. Thus, the federal courts have been understandably reluctant to intervene in matters of state prison administration, recognizing that a wide latitude for judgment and discretion must be extended to prison officials."

Gittlemacker v. Prasse, 428 F.2d 1, 4 (3rd Cir. 1970).

 Of course, the same reluctance to interfere applies to federal prisons. Long v. Parker, 390 F.2d 816, 820 (3rd Cir. 1968). With these general principles guiding the way, I now turn to the specific issues advanced here.

In support of their constitutional challenges, plaintiffs presented evidence which focused upon: (a) the alleged misconduct of certain inmates at the time of the work stoppage, while serving on the negotiating committee, and in responding to the "back to work" questionnaire; (b) the proceedings before the Adjustment Committee and the Good Time Forfeiture Board; and (c) the conditions existing in segregation, particularly in S–1.

*I. Inmate Misconduct* Plaintiffs recognize, as they must, the wide latitude

---

6. McAllester testified that he told the interviewer that he chose to remain mute and declared that he did not want to be forced "to pick a side" between the administration and the inmates.

vested in prison officials, but assert that their Fifth and Eighth Amendment rights were violated in that they were punished for acts which did not constitute offenses and the punishment inflicted was disproportionate to the offenses found to have been committed.

The misconduct reports filed during the February 15th to March 4th period contained charges of attempting to incite a work stoppage, soliciting support for continuing the work stoppage, and conduct prejudicial to the good order, security, and safety of the community and of the inmate population. While plaintiffs Phillips, Meyers, Irwin, Jones and Alger disclaimed any responsibility for instigating or encouraging the work stoppage, their actions, e. g., Phillips reading the Prisoners' Bill of Rights and the distributing of papers by Meyers, cannot be considered coincidental or accidental. Phillips conceded that he wanted a strike and knew it would disrupt the prison albeit disclaiming any knowledge that it violated prison rules. Irwin, with commendable candor, admitted that he was angry with the Parole Board and upset about the low pay rate and that he was "very emotional" when he addressed the group assembled in the prison yard. Jones also admitted making a speech commenting that he felt he had "nothing to lose". The result was the eventual shutdown of the institution as some inmates walked off their jobs on their own initiative while others left when told that it was permissible if they so desired. From the very beginning, prison officials attempted to determine the cause of prisoner unrest and sought the compilation and submission of grievances. In all probability if grievances had been prepared, the matter could have been considered, and hopefully adjusted, without trouble. Consequently, at the heart of the problem, certainly from an administrative view, was the identification and submission of grievances. Inmate representatives were encouraged and sometimes implored to proceed with this assignment. Progress became mired down, however, in the five original demands, from which the committee was unwilling to recede. Prison officials became convinced that the committee did not intend to document the grievances that gave rise to the work stoppage and concluded that the real objective was to disrupt and shut down the prison itself. While the protestation was made at the hearing that a list of grievances had been compiled and was in Meyers' possession, the Chairman of the Committee, viz., Irwin, testified that he had never seen it prior to the hearing. Accordingly, the committee was disbanded, misconduct reports were filed and hearings held before the Prison Adjustment Committee and, in some cases, before the Good Time Forfeiture Board.[7]

The cases of plaintiffs Phillips, Meyers, Jones, Alger and Irwin were referred by the Adjustment Committee to the Good Time Forfeiture Board where all were found guilty and retained in segregation. In addition, the Board recommended that their earned good time be forfeited: viz., Phillips 416 days, Meyers 187 days, Jones 200 days and Alger 90 days, but the Warden forfeited only 30 days and suspended the balance contingent upon the inmate not incurring a major misconduct report for 6 months. (There is nothing in the record concerning the amount of good time forfeiture recommended by the Board to the Warden in Irwin's case, but it is conceded that there was a forfeiture.)[8] Mc-

7. As will appear later in this opinion, the basic authority for the administration of inmate discipline is placed in the Adjustment Committee which conducts the initial hearing and is empowered to impose a broad range of punishment. The most serious cases are also referred to the Good Time Forfeiture Board where an inmate's earned good time may be forfeited.

8. On appeal to the Bureau of Prisons, General Counsel found that the actions taken by the Warden were supported by the record and appropriate for the misconduct involved, and approved all forfeitures but, in the cases of Irwin, Alger and Mason, advised the Warden to remand all but 15 days.

Allester appeared before the Adjustment Committee on March 10th, was found guilty; his statutory good time for the month was withheld; and he was released from segregation, having been confined there from February 27th. As of June 8, 1972, Irwin, Phillips, Meyers, Alger, Jones, Johnson and Tucker remain in segregation.

The argument that the inmates' acts did not constitute offenses appears to be predicated on assertions that there must be published rules and regulations specifying prohibited conduct, or that the actions of the inmates cannot be considered as misconduct. There is more than ample evidence that the punished inmates either participated in the instigation of the work stoppage and/or interfered with the attempt of the administration to resolve the dispute and bring the stoppage to an end. Such action by prisoners plainly constitutes misconduct and does not require a specific, written rule before an inmate should know that such activity is not acceptable in a prison setting. While published rules may be desirable and, in some circumstances, absolutely necessary before punishment may be exacted, the activities complained of here do not require definition or explanation as they clearly constituted unacceptable prison conduct.

Plaintiffs argue additionally that the punishment inflicted, i. e., commitment to segregation and, in some instances, forfeiture of good time, was disproportionate to the alleged offenses charged and violated due process of law as well as the Eighth Amendment ban on cruel and unusual punishment. I find no such disproportion here. The offenses charged to these inmates of participating in and actively encouraging a work stoppage and intentionally refusing to submit grievances, considering the circumstances prevailing at the time, i. e., a tense, charged atmosphere in an institution that had been brought to a halt, were serious indeed. The attitude of McAllester and Moore, even though they were not involved in the February 15th incident and were not part of the inmates' committee, was one of uncooperation and, if indulged in by all, would have continued the crisis indefinitely and might have led to more disastrous consequences.

■ Accordingly, I hold that the punishment imposed was justified under the circumstances of this case and did not violate either the requirements of due process of law or the ban on cruel and unusual punishment.

■■ *II. Conditions in Segregation* Solitary confinement in and of itself does not violate Eighth Amendment prohibitions and the temporary inconvenience and discomforts incident thereto cannot be regarded as a basis for judicial relief. Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3rd Cir. 1969). It is only when solitary confinement becomes "so foul, so inhuman and so violative of basic concepts of decency", Wright v. McMann, 387 F. 2d 519 (2d Cir. 1967), that a federal court should interfere with prison officials who purportedly have the experience and expertise in matters of prison discipline. And this is so even though the policy may seem unsound or personally repugnant to the judiciary, Sostre v. McGinnis, 442 F.2d 178, 191 (2d Cir. 1971).

There was an abundance of testimony, pro and con, relative to the crowded conditions in S–1, the sparsity of food, the denial of access to legal material, the refusal to furnish medical assistance, and the denial of basic requirements, such as adequate clothing, bedding, sanitary facilities and hygienic care.

I will not burden the record with any detailed analysis of the testimony concerning denial of legal material and medical assistance because I am satisfied that the evidence adduced did not support plaintiffs' contentions. Plaintiffs' testimony was vague, and conclusory and was more than adequately overcome by defense testimony which I found credible. The limited testimony concerning physical abuse was also unreliable and unpersuasive and, therefore, was rejected.

On the issue of the denial of basic requirements, plaintiffs charge (a) that some inmates were placed in S–1 in a naked state and, in some instances remained that way for several days; (b) that some cells had only one or two mattresses for four and five inmates; (c) that meals in segregation were wholly inadequate, including the testimony of inmate Rosario that the food provided in one meal could have been placed on the small paper container used for one pat of butter; (d) that inmates in segregation were not allowed to shower or to exercise; Alger claiming he was allowed to shower 2 or 3 times in 32 days and Phillips stating that he had only 2 one-hour exercise periods in 43 days; (e) the cells in S–1 were dirty and unsanitary; and (f) the cells were cold and air circulation was poor.

Defense witnesses countered (a) that no inmates were placed naked in segregation; (b) that segregated inmates received three meals a day of average portions while the general population received only two; (c) that every inmate was provided with a mattress and blanket; (d) that while no showers were permitted during the emergency period from Monday, February 28th, to Friday, March 3rd, at all other times segregated inmates were allowed to shower at least once a week and that the log book maintained in S–1 revealed, for example, that Alger showered 10 times in 5 weeks and Phillips showered 4 times in 2 weeks; furthermore, that while exercise periods were limited during the same period, inmates normally are allowed to exercise up to 2 or 3 times a week while in segregation; (e) that once a week each cell was furnished a mop, brush, rag and scouring powder in order to maintain cleanliness; and (f) that ventilation in S–1 is maintained by a blower system in which a one-horsepower air compressor circulates air through vents in each cell providing a complete air change every 20 minutes and the system is thermostatically controlled to operate between 68 to 85 degrees.

■ After carefully considering all the evidence, I am convinced that plaintiffs' testimony concerning the denial of basic requirements is greatly exaggerated and inconsistent. For example, inmate Moore testified that another inmate, Jerry Singletarry was nude in their cell for 3 days while Singletarry, in his testimony, stated that he was nude for 2 hours. Inmate MacCray testified that inmates Bullock and Thomas were naked for 2 or 3 days, while Bullock said that he had not been given clothes for a day and a half, but that MacCray gave him his trousers and, further, that the other men in the cell with them had shirts, shorts and trousers. Inmate Baskin testified that inmate Glover was put into the cell naked while another inmate, Evans, stated that Glover was wearing slacks. Moreover, in addition to the testimony of prison employees refuting the charges of nakedness, inmates Nakoi and Beal, who were in charge of issuing clothing when the men involved were placed in segregation, stated unequivocally that no inmate was placed into a cell naked. Beal did say that Singletarry was belligerent and refused to put his clothing on after the strip search,[9] but that his clothing was put into the cell with him. In addition, inmate Callahan, an orderly in S–1, was called by plaintiffs and testified that he "never saw a man go into a cell naked". It may very well be that Singletarry and others [10] may have removed some clothing while in the cell, but fault for this cannot be ascribed to prison personnel.

---

9. Each inmate must strip down and be searched before he is placed in segregation.

10. There was some evidence by plaintiffs of an inmate named Labbe who was naked in his cell, but defense testimony indicated that this inmate had completely disrobed in the Recreation Area while chanting phrases, such as "love", "body beautiful", and "peace", and had to be removed to segregation where he may have repeated this performance.

Similar conflicting testimony was offered concerning the alleged shortage of blankets and mattresses. Once again, the inmate orderlies corroborated prison officials. Nakoi testified that everyone received a mattress, blanket, clothing, cup, toothbrush, toothpaste, soap and towel, and that he, personally, placed the mattresses in the cells. Again, Nakoi's version was supported by Beal and Callahan.

Perhaps the greatest testimonial disparity concerned the amount of food served in segregation during the critical period when all segregation units were filled to, and beyond, capacity.[11] The versions ranged from examples of 2 or 3 peas, 2 kernels of corn, a small bite of meat and a swallow of coffee, to generous portions that spilled over the edges of the paper plates which are used in segregation. However, some points are undisputed. Three meals each day were served in segregation compared to two in general population. Only one hot food cart was used and this listed a capacity of 65, while there were 115 in segregation. Some inmates, however, described fairly ample portions, e. g., inmate Ralph Colburn, a food service orderly, was called on behalf of plaintiffs and while contending that during the week of February 28th, certain meals were inadequate, e. g., one meal with servings of 3 to 5 peas, 3 carrots, beef liver 2 inches in diameter, ½ to 1 tablespoon of coleslaw, 1 slice of bread and pat of butter, a small square of cottage pudding cake and ½ cup of coffee, he also described some quite ample meals, e. g., a breakfast meal consisting of a package of dry cereal, farina, 1 piece of French toast, 1 piece of sliced toast, ½ paper cup of milk and ½ cup of coffee. It is my judgment that the portions for some meals were sparingly provided, but this may have been necessitated by the personnel crisis existing at that time. I do not conclude that there was a deliberate administrative effort to underfeed the segregated prisoners and I am satisfied that it does not even approach the level of deprivation that would constitute, either alone or in combination with other circumstances, cruel and unusual punishment.

When first drafting this opinion, it was my intention to question the purpose and necessity of the prison policy limiting exercise opportunities to inmates in segregation. The policy then prevailing was to forbid any exercise privileges to inmates in S–1 and only one hour per week to other segregated inmates after they had been confined more than 30 continuous days. Fortunately, this policy has been changed somewhat drastically by the newly promulgated policy on inmate discipline and inmates are now to receive *no less* than two exercise periods of one hour each week. (emphasis supplied) It is true also that defense witnesses testified that, notwithstanding the prison policy, two or three exercise periods were permitted each week and that the limitation complained of was necessitated by the emergency situation then existing. In any event, the emergency has now passed and a new policy has been adopted.

There was sparse testimony offered in support of the assertion that the cells in S–1 were dirty and unsanitary. I found it to be unconvincing and accept the contradictory testimony that, even during the emergency period, cleaning materials were issued to all cells.

The complaint concerning the coldness of the cells and staleness of the air was similarily unreliable. Most inmates charged that the cells were extremely cold, but inmates Baskin and Evans complained that the cells were overheated. Moreover, the ventilating and heating facilities were thermostatically controlled and to accept plaintiffs' version of the conditions would require a finding that prison employees interfered with that function, and I refuse to so find.

11. At the time of the first hearing, March 29th, there was one inmate in S–1, and during the second hearing, May 12th, when the Court and counsel visited S–1, there were no inmates confined there.

■ The concentration of inmates in S–1 cells from February 27th to March 4th, viz., 56 men in 13 cells, does cause me some concern, however, although I cannot conclude, under the circumstances, that it rose to the level of cruel and unusual punishment. Because of the emergency situation then prevailing, the judgment call of the administration that it would be easier to control the situation in S–1 because it receives around the clock supervision cannot be disregarded entirely. The additional reasons advanced that the higher levels of segregation were not used because prison officials did not want to discomfort those who played no part in the work stoppage and were concerned that other inmates might be "stirred up", does not comport with reality because the supposed instigators, including plaintiffs, were located in S–5, some of them alone and others sharing a cell with one other inmate. It would seem, therefore, that part of the S–1 overflow could have been moved in with them. However, while I question the merits of this judgment, I am not prepared to hold that it was arbitrary or capricious. Moreover, the wisdom of, and necessity for, continuing to hold some inmates in segregation may be disputable, but at the present time, it does not constitute a constitutional deprivation requiring judicial intervention.

In sum, despite my personal abhorrence to segregation and its concomitant privations, except where absolutely necessary, I can find no violation of Fifth or Eighth Amendment rights from either the conditions existing in segregation or a determination that confinement in segregation under those conditions constituted punishment disproportionate to the offense.

*III. Procedural Due Process* The control and management of federal penal and correctional institutions is vested in the Attorney General, 18 U.S.C. § 4001, and responsibility for administration and supervision is delegated by statute to the Bureau of Prisons, under the direction of the Attorney General 18 U.S.C. § 4042.

Disciplinary procedures at the Lewisburg Penitentiary follow the policies and standards of the Federal Bureau of Prisons (Bureau of Prisons Policy Statement; Inmate Discipline July 2, 1970).[12] When a correctional officer witnesses or hears of a report of misconduct by an inmate, he is required to fill out a charge of misconduct and submit it to the Watch Supervisor, who is a Lieutenant. The Lieutenant then investigates the charge and may talk to the inmate, after which he makes a decision as to whether the misconduct constitutes a minor or a

12. On June 6, 1972, the Bureau of Prisons issued a new Policy Statement on Inmate Discipline in which many of the remedies argued for strenuously and capably by plaintiffs' counsel were provided. For example, each inmate is to be provided with a booklet or pamphlet at the time of his arrival at a federal institution which will contain a full and comprehensive statement of (a) his rights and responsibilities, (b) acts prohibited in the institution, and (c) the types of disciplinary action which may be taken. Additionally, the procedural requirements before the Adjustment Committee have been expanded and now provide that investigation of the charges and written notification to the inmates of the charges must be done within 24 hours of placement in segregation; neither the reporting or the investigating officer shall be a member of the Adjustment Committee; the Committee must meet no less than three times a week; all inmates in segregation status will be reviewed at least once a week on the record and every inmate who spends over ten continuous days in segregation status will appear before the committee for a formal review, which review will be repeated every 30 days with the further proviso that there will be a psychiatric or psychological review if the commitment to segregation continues beyond 30 days. Finally, each segregated inmate will be allowed to shave and shower at least twice a week and shall be permitted no less than two exercise periods of one hour each week. Many other changes are provided for in the new Policy Statement but will not be itemized here. Furthermore, a more complete and particularized analysis of the evidence and the Committee's findings will now be required. The procedure before the Good Time Forfeiture Board was not changed, at least at this time.

major offense. If he concludes that it is minor, then he may restrict the inmate's privileges for no more than two weeks and/or remove the inmate from honor quarters. Major misconduct reports are referred to the Adjustment Committee for a hearing and, if warranted, the inmate may be separated from population and placed in segregation immediately. The Adjustment Committee is composed of four members of the administration, viz., the Associate Warden, as Chairman, the Chief Correctional Supervisor, a case worker, and a medical officer. The Committee meets every Monday and Friday. The Committee has a range of actions available to it: it may exonerate the inmate and order the charge removed from his record; it may release him from segregation, with time served; it may order him continued in segregation, to be reviewed at a later time; it may order his return to population with certain restrictions or withdrawal of privileges (such as movies, commissary, visiting), or removal from certain programs or assignments (a particular job or quarters assignment, an assignment with extra rewards, such as meritorious service award or extra good time); it may transfer the inmate to another prison; it may withhold his statutory good time for the month of the offense, and it may refer the matter to the Good Time Forfeiture Board.

The procedure before the Adjustment Committee is to call the inmate before it, advise him orally of the charges against him, and ask for his statement. If the inmate denies the charge and the Committee has a doubt concerning it, the matter may be referred back for further investigation and report to the Committee. The inmate is not allowed the assistance of counsel or a counsel substitute and is not allowed to confront and cross-examine witnesses. The Committee makes its decision based upon the report, other written statements submitted to it, and the interrogation of the inmate. If the Committee finds the inmate guilty of the offense charged, he is notified orally and a written report of the Committee's findings is then filed. When a man is placed in indefinite segregation, his case must be reviewed monthly by the Adjustment Committee to see if the intended purposes of such confinement have been achieved.

As previously noted, violations considered more serious are referred by the Adjustment Committee to the Good Time Forfeiture Board for consideration of forfeiting good time already earned or accrued to the date of the offense.[13] The procedure at this hearing follows the Bureau of Prisons Policy Statement on Withholding, Forfeiture, and Restoration of Good Time, 7400.6A adopted August 13, 1971. The Board consists of three members; the Associate Warden is chairman and the remaining members are the Superintendent of Industries and the administrative head of another department. At the hearing, the inmate is given a copy of the charges and is advised of the procedures to be followed. If the inmate admits the charges, he is given the opportunity to make a statement in mitigation. If he denies the charges, he is told that he can have any representative of the institutional staff to represent him before the Board. He is also given the opportunity to confer with this representative. The evidence in support of the charges, usually in written form, is then considered by the Board. After the evidence supporting the misconduct report is considered, the inmate or his representative is permitted to make a statement. The inmate can also request witnesses on his behalf and the chairman will call those witnesses, limited to staff or inmates, who are available and who are determined by him to be necessary for the determination of the charges.

---

13. Under 18 U.S.C. § 4161, an inmate who faithfully observes all rules and has not been subjected to punishment shall be entitled to a deduction from the term of his sentence of five to ten days for each month, depending upon the sentence received. Title 18 U.S.C. § 4165 provides that earned good time may be forfeited for committing any offense or violating the rules of the institution.

Unavailable witnesses may be asked to submit written statements. After the hearing a summary report of the Committee proceedings and its findings is prepared and the Committee makes a recommendation for any forfeiture action to the Warden, who reviews the report and orders any forfeiture he deems appropriate. The inmate is advised that he can appeal the Warden's decision to the Office of General Counsel and Review the inmate does not receive written notice of the charges against him in advance of the hearing (although he would be aware of the nature of the charges as a result of his appearance before the Adjustment Committee); is not entitled to confront and cross-examine adverse witnesses, and is not entitled to the assistance of counsel or counsel substitute.

Plaintiffs contend that the disciplinary procedures outlined above are constitutionally deficient in that they are being subjected to the possibility of additional punishment without being provided with minimal procedural safeguards. They contend that due process requires a reasonable investigation into the relevant facts, advance written notice of the charges against them, an opportunity to present a defense, including the right to call witnesses and to cross-examine their accusers, the assistance of counsel or counsel substitute, a trial before an impartial tribunal with a decision based on evidence adduced at the hearing, and the right to an appeal.

 In the past few years, numerous federal courts have struggled with the problem of determining to what extent the procedural safeguards of the Due Process clauses of the Fifth and Fourteenth Amendments are applicable to disciplinary hearings in our nation's prisons. Although the results have not always been consistent,[14] some basic principles have emerged. The courts are unanimous in rejecting the view that once an individual is imprisoned, he may be confined in any manner chosen by his jailors, subject only to the proscription of the cruel and unusual punishment clause of the Eighth Amendment and that "custody is custody" no matter how it is carried out, so that a prisoner suffers no real loss when the nature of his custody is changed. See e. g., Clutchette v. Procunier, 328 F.Supp. *supra* at 780. Consistent with this reasoning, they are also unanimous in recognizing that among the constitutional rights a prisoner retains when he enters prison is the right to procedural due process in connection with the imposition of additional punishment for a breach of prison discipline. See e. g., Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Alverez v. Turner, 422 F.2d 214 (10th Cir. 1970); Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966); Braxton v. Carlson, 340 F.Supp. 999 (M.D.Pa. April 7, 1962); Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y. 1970); Morris v. Travisono, 310 F.Supp.

---

14. Some of the federal courts which have considered the procedural due process question in cases involving the imposition of substantial deprivations have required safeguards which encompass most of the protections afforded one criminally accused at trial. *See* Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D. Cal.1971); Morris v. Travisono, 310 F. Supp. 857 (D.R.I.1970); McCray v. Maryland, 10 Cr.L.Rep. 2132, (Circ.Ct. Mont.Co.Md., 1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971). Other courts have required somewhat less. *See* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966); Braxton v. Carlson, 340 F.Supp. 999 (M.D. Pa., April 7, 1972); Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970).

857 (D.R.I.1970). While neither the United States Supreme Court nor our Third Circuit Court of Appeals has expressed an opinion on the issue,[15] the *above-cited cases are in agreement that where an inmate may be subject to substantial deprivations, such as the loss of accumulated good time or the opportunity to accrue good time which has the effect of extending an inmate's stay in prison,* Peyton v. Rowe, 391 U.S. 54, 56 n. 3, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968) ; *or the confinement to segregation, all involve a sufficiently grievous loss to require the essentials of due process. They have not, however, arrived at the same conclusion as to the difficult question of what process is due.* Sostre v. McGinnis, 442 F.2d *supra* at 196.

Fundamental to any discussion involving the perimeters of procedural due process is a consideration of the Supreme Court's decision in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). *Goldberg* held that before welfare benefits may be terminated, the agency must conduct an adversary proceeding with all the elements of due process incident thereto. These included advance written notice and a hearing at which the welfare recipient may cross-examine adverse witnesses and be represented by counsel, a written statement of reasons for any termination, including some indication of the evidence supporting the adverse decision. *Goldberg* found that due process was an elusive concept, its boundaries and its content

varying according to specific factual contexts. To this end, the Court stated:

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168 [71 S.Ct. 624, 627, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant *Workers Union* [etc.] v. McElroy, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *See also* Hannah v. Larche, 363 U.S. 420, 440, 442 [80 S.Ct. 1502, 1513, 1514, 4 L.Ed.2d 1307] (1960)." Goldberg v. Kelly, 397 U.S. *supra* at 262, 263, 90 S.Ct. at 1017.

In attempting to apply this due process standard announced in *Goldberg* to the prison environment,[16] the federal courts have formulated a general rule that the process which is due an inmate before he is held to have committed a disciplinary infraction is to be determined by balancing the seriousness of the possible

15. While the Third Circuit has not spoken on this issue, it has indicated that minor prison matters, such as a transfer from one wing of prison to another, do not involve sufficiently substantial deprivations so as to require constitutional protection. Hanvey v. Pinto, 441 F.2d 1154 (3d Cir. 1971).

16. The principles set down in *Goldberg* have been applied to require a hearing providing the essentials of due process in a wide variety of situations having less serious consequences than the "substantial deprivations" possible in a prison en-

vironment, e. g. wage garnishment, Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) ; driver's license, Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ; ability to purchase liquor, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), disqualification of unemployment compensation, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ; denial of tax exemption, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

punishment against the institution's interest in summary adjudication.[17] Also involved in this balancing process is the value of the particular safeguard to the inmate in the circumstances of a prison disciplinary hearing. *See* Sostre v. McGinnis, *supra;* Nolan v. Scafati, *supra;* Landman v. Royster, *supra;* Clutchette v. Procunier, *supra.* In addition, as the *Sostre* court noted:

> "[t]o dispose sensitively and carefully of each prisoner's unique case with due regard for the effect of each decision on the total fabric of the prison community, prison authorities must have wide access to relevant information."

The court also expressed unwillingness to interfere with state administrative processes when reliable, detailed information or empirical studies are so scanty as they are on the subject of prison disciplinary procedures. While not suggesting the strict requirements of due process, the court declared that if substantial deprivations are to be visited upon a prisoner, such action should at least be premised on facts rationally determined.

█ Persuaded by the reasoning in *Sostre,* I conclude that the procedures provided for in the Adjustment Committee hearings satisfied the requirements of due process. Sostre's punishment included solitary confinement for an indefinite period and loss of the opportunity to earn 124⅓ days of good behavior credit during the 12 months and 8 days he remained in segregation. Although the District Court found that procedural requirements, similar to those requested by plaintiffs here, were necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner, the Court of Appeals reversed and rejected such requirements, explaining that in so doing it did not imply that prison discipline could be administered arbitrarily or capriciously but that such basic safeguards against arbitrariness as adequate notice, an op-

portunity for the prisoner to reply to charges lodged against him and a reasonable investigation into the relevant facts, must be provided. Such safeguards were provided before the Adjustment Committee.

Although the Good Time Forfeiture Board is empowered to impose more severe penalties, it also provides additional procedural safeguards. As more fully set out previously, inmates appearing before the Good Time Forfeiture Board are provided with a written notice of the charges, the right to be represented by a member of the institutional staff, the opportunity to make a statement either in denial or mitigation of the charges, the right to call witnesses who are deemed by the chairman to be necessary for a determination of the charges, a summary report of the committee's findings, and the right to an appeal to the Office of the General Counsel. Plaintiffs maintain that they were entitled additionally to have the assistance of counsel or a counsel substitute, to have an impartial tribunal, and to confront and cross-examine adverse witnesses.

█ I choose to follow the advice of *Sostre* that the need for legal skills is less acute at a prison hearing and, as a result, the assistance of a staff representative, personally chosen by the inmate, is adequate.

█ Plaintiffs also challenge the composition of the Board as not constituting an impartial tribunal. They complain that the panel member should be free of prior involvement with the incident and specifically find fault with the fact that the Warden finally forfeited the good time and also was the person who originally charged them with the offense. Because the work stoppage involved the entire prison community, it would be difficult to find a Board member who did not have some knowledge of, or association with, some of the incidents connected with the stoppage. This exposure does not, ipso facto, disqualify them

---

17. Whether a loss is "grievous" must depend on what is the *potential* punishment and not what is *actually* ordered.

from serving on the Board although it would most certainly be better practice to excuse any Board member who has any involvement with the circumstances forming the basis for the charge. In any event, it may be difficult for prison officials to divorce themselves from information or knowledge obtained from prior contact or from outside sources, but such difficulty must be overcome. It scarcely needs stating that they would do violence to their integrity and the validity of the Board's undertaking, if they either prejudged the matter before them or did not make a special effort to perform their hearing role in a truly impartial manner.

■ The failure to produce witnesses before the Board in support of the charges against the inmates, causes me some concern although I do not believe it is constitutionally required. However, the desirability of such a policy, absent special circumstances, should be examined. While the Bureau of Prisons Policy Statement would support an interpretation that witnesses are called in support of the charges against an inmate, we are told that, in actuality, this seldom occurs as reliance is usually placed on written reports and statements. In my judgment, the deprivation visited upon an inmate by the forfeiture of good time is more substantial than immediately meets the eye. The purpose underlying good time allowances is to enable a prisoner to serve the latter part of his sentence outside prison walls, i. e., it reduces the maximum time he can be required to serve in prison under the sentence imposed. While the loss of this good time is serious, the evidence at the hearing revealed another grave consequence to an inmate, viz., if any amount of good time is forfeited, he is not considered to be in parole status and, unless the good time is restored,[18] he is advised not to apply for parole. Testimony at the hearing indicated that ordinarily the restoration of good time is not considered for nine months to a year.

Under 18 U.S.C. § 4202, a federal prisoner, who has observed the rules of the institution in which he is confined, may be released on parole after serving one-third of his term. The serious consequence to an inmate while under the burden of forfeited good time is patent as, unless it is restored, he could presumably be denied parole opportunities indefinitely and not be eligible for release until his full term is served.

■ I realize full well that parole is a matter of legislative grace and that it is conditioned on demonstrated obedience to prison rules, but all are eligible for its benefits in the absence of some administrative disqualification. If an inmate is to be disqualified, every effort should be made to guarantee that such action was premised on facts rationally determined. The confrontation and cross-examination of witnesses should be of great aid to the Board in its effort to reach a just result. I cannot see this as creating a great burden on the administration as, compared to the frequency of Adjustment Committee meetings, there are relatively few Board hearings. The witnesses, in most instances, would be readily available and could provide more information than that normally contained in a written report. Moreover, it would appear that the Bureau of Prisons recognizes the difference in scope and power of the two bodies as more protections are afforded the inmate before the Board than before the Adjustment Committee. The Adjustment Committee sits as the primary disciplinary body and metes out punishment that generally affects the conditions under which an inmate functions while in prison. The Good Time Forfeiture Board, however, determines not the conditions of confinement but, in a large sense, the length of it. Hence, I would recommend such a practice but would not order it as constitutionally indispensable.

18. The Attorney General may restore any forfeited time as he deems proper upon the recommendation of the Director of the Bureau of Prisons 18 U.S.C. § 4166.

After a careful consideration of all the contentions so carefully and ably advanced by plaintiffs' counsel, I conclude that plaintiffs are not entitled to relief and their complaint will be dismissed.