Joel MEYERS et al., Appellants,

v.

Noah ALLDREDGE, Warden, United States Penitentiary at Lewisburg, Pennsylvania, et al.

No. 72–1819.

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1973.

Decided Feb. 14, 1974.

---

Herman Schwartz, Prisoners' Rights Project, American Civ. Liberties Union Foundation, Amherst, N. Y., Michele Hermann, Legal Aid Society, New York City, Leonard Kolleeny, New York City, Counsel for Prisoners Solidarity Comm., Ambrose Campana, ACLU of Pennsylvania, Williamsport, Pa., for appellants.

S. John Cottone, U. S. Atty., and Julius Altman, Asst. U. S. Atty., Scranton, Pa., Clair A. Cripe, Asst. Gen. Counsel, U. S. Dept. of Justice, Bureau of Prisons, Washington, D. C., for appellees.

Before STALEY, VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a district court decision and order [1] dismissing a complaint filed by eleven inmates at Lewisburg Federal Penitentiary, challenging the actions of prison administrators during and after a work stoppage at Lewisburg in February 1972.[2] In their complaint, filed on behalf of themselves and all inmates at Lewisburg,[3] plaintiffs contended that (1) the disciplinary procedures afforded plaintiffs and their class were so inadequate that they failed to comply with procedural due process; (2) the actions of the administration were so fundamentally unfair and the charges against plaintiffs and their class so fundamentally untrue as to constitute a violation of substantive due

---

1. The district court opinion is reported at 348 F.Supp. 807 (M.D.Pa.1972).

2. Jurisdiction was invoked under 28 U.S.C. § 1331(a) and 28 U.S.C. § 1361. The complaint as a whole makes clear that (1) the allegation in paragraph 1 that "the matter in controversy exceeds . . . the value of $10,000 exclusive of interest and costs" was not incorrect "to a legal certainty," see Saint Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Nelson v. Keefer, 451 F.2d 289, 292–293 (3d Cir. 1971); and (2) the district court had jurisdiction under 28 U.S.C. § 1361 over the defendant "officer or employee of the United States" (see, for example, par. 20 of complaint).

3. Although the complaint alleges that the action is brought by named plaintiffs in behalf of all other prisoners held in solitary confinement or deprived of good time for alleged activity relating to the work stoppage, there is no order of the district court determining that the action is to be so maintained, as required by F.R.Civ.P. 23(c)(2). See Davis v. Romney, 490 F.2d 1360, at 1366 (3d Cir. Opinion of Jan. 14, 1974, Seitz, Chief Judge).

Although the complaint did not name William McAllister as a plaintiff, counsel for plaintiffs, by letter of October 17, 1973, informed this court that both counsel considered him as a plaintiff and counsel for defendants has no objection to treatment of him as a plaintiff.

process; and (3) the punishments inflicted upon plaintiffs and their class were so harsh and disproportionate to the alleged infractions as to constitute cruel and unusual punishment. Plaintiffs sought injunctive and declaratory relief.[4] After extensive hearings, the district court rejected the above contentions and dismissed the complaint.

## I.

The facts surrounding the work stoppage and giving rise to the present case are as follows. On the morning of February 15, 1972, rumors of a work stoppage reached prison officials. After the noon meal, between 150 and 200 prisoners congregated in an open area near the prison warehouse. At the behest of Chief Correctional Supervisor Paul Dodd, who had come to investigate the situation, an inmate named Saunders ascended a loading platform to inquire what the men were doing. At this point, numerous other inmates climbed upon the platform, and some, including plaintiffs Phillips, Irwin, Jones and Mason, made brief speeches referring to inmate rights and grievances and expressing general dissatisfaction. Because of cold and snow, Captain Dodd suggested that the inmates move inside to the auditorium to continue their meeting and that they prepare a list of grievances which he would submit to his superior. He requested further that they remain non-violent and stated that there would be no reprisals as long as they remained non-violent and gave him grievances.

The inmates continued their meeting inside the auditorium until 3:30 p. m., during which time they formed a nine-man committee to represent the inmate body in meetings with prison officials.

By late afternoon, virtually all inmates had left their job assignments, either in protest or pursuant to permission from the prison administration. A meeting with prison officials scheduled for 6:30 p. m. failed to materialize when many prisoners complained that the nine-man committee was not representative. Accordingly, the inmates reconvened after dinner and elected a 16-man committee (hereinafter referred to as the "first committee"), with plaintiff Irwin as chairman and plaintiffs Meyers, Phillips, Jones, Johnson, Mason, Tucker, Buyse and Alger as members. Irwin thereupon informed Associate Warden George L. Cansler that (1) because the committee desired to formulate grievances, it could not meet with administration officials until the next morning, and (2) they were shutting down all work activity, except in the hospital.

At the meeting the next morning, with the entire institution shut down as a result of the strike, the first committee presented to the prison officials a list of five demands which the committee specified would have to be met before they would proceed to anything else. These demands were: (1) a letter from the Warden recognizing the negotiating committee as such; (2) a letter confirming that there would be no reprisals against members of the committee; (3) reopening of the visiting room; (4) an attorney to represent the committee; and (5) the presence at their meetings of a member of the press.[5] After consideration of the demands, Warden Noah Alldredge, in the presence of the committee, informed its members that all five demands had been rejected, but he explained that his mere presence at the meeting indicated his recognition of

4. The specific prayers for relief stated in the complaint which present any substantial legal problem on this record at this time are these:
 (a) A preliminary and permanent injunction against further confinement in segregation without being afforded hearings which meet due process requirements.
 (b) A preliminary and permanent injunction against holding any hearings of the

Good Time Forfeiture Board which do not comply with the requirements of due process of law.

5. The list of demands also contained the notation that the demands should be read to the population over the public address system.

the committee. He added that "there would be no reprisals so long as they functioned as a committee in good faith and did not commit an illegal act." Finally, he requested that they compile grievances, admonishing them that if they did not prepare and submit grievances by 3:00 p. m. that day, he would disband the committee. One of the committee members, Scully, refused to permit the Warden to read an official policy statement to the committee.[6] At 3:10 p. m., when no grievances were forthcoming, the first committee was disbanded.

Shortly thereafter, the general inmate population was called upon to elect a new committee, and a new committee was formed. The next day, Thursday, February 17, however, the second committee encountered resentment and distrust among the general population and was quickly forced to disband when a non-plaintiff member of the first committee (Scully) disrupted its meeting.[7] Later that afternoon, plaintiffs Irwin, Phillips, Alger, Mason, and other members of the first committee were placed in segregation. Misconduct reports were also filed, charging them with attempting to incite, and soliciting support for continuation of, a work stoppage because of their speeches on February 15 and conduct thereafter.[8]

The work stoppage continued without any violence,[9] but also without any sign of resolution, through the week-end and into the next week.[10] Finally, on Wednesday, February 23, administration officials attempted to put the institution back to work, but they learned from normally pro-administration, honor inmates that the general population wanted the first committee reactivated, with observers attending its meetings so they could report to the general prison population on whether the committee was honestly interested in presenting grievances (348 F.Supp. at 812). In an endeavor to reach a prompt and mutually agreeable end to the strike, prison officials decided to let the first committee reconvene, with such observers present. At 11:30 a. m. on Thursday, February 24, the 11 first committee members in segregation were brought out and met with the five first committee members who had remained in the general population and with the four observers. After a hectic meeting which lasted several hours, the observers were ejected. The committee continued to meet until 10:00 p. m. that evening, but no progress on the preparation of grievances was made because the committee was bogged down by a dispute as to whether they should refuse to negotiate until the Warden formally recognized them in writing.

6. The trial judge made these findings:
"When the Warden attempted to read a Bureau of Prisons Policy Statement to the committee, one of its members, Walter Scully, leaped to his feet and refused to allow the statement to be read. Scully also emphasized that the five demands would have to be met before the committee would begin to work on grievances." 348 F.Supp. at 811.

7. After circulating among the prison population to collect grievances, the second committee had requested a meeting with the first committee but the members of the first committee, including plaintiffs, refused.

8. The record indicates that misconduct reports charging Phillips, Jones, Alger and Irwin with "attempting to incite a work stoppage" were filed on February 15. Although no such report concerning Mason was received in evidence as an exhibit, the record

of Mason's Good Time Forfeiture Board hearing, which was received into evidence, indicates that he was charged with the same offense. A misconduct report charging Jones with "soliciting support for the continuation of the work stoppage" was filed on February 19, and a misconduct report for "refusing to obey a direct order" was filed against Meyers on February 16.

9. There was one threat of violence, and a subsequent shakedown throughout the institution resulted in the confiscation of 150 weapons, such as knives, hatchets, and similar instruments.

10. During the strike, there were virtually no services within the institution, and all staff members worked 12 to 18 hours per day to maintain basic services and supervision. Meals were prepared by staff members but could only be served twice daily to the whole population.

The next morning, the Warden presented the committee with a memorandum in which he criticized the members for failing to present grievances, stated that he was "almost convinced" that they did not intend to submit grievances, but advised them that they would be allowed to meet on a daily "round the clock" basis until they were "able to produce some grievances representing the general population." The committee was further told that the Warden would reply to the grievances in two weeks in the prison newspaper and that the grievances would be sent to an outside group chosen by the inmates. At 2:00 p. m., the committee decided, by a 13–2 vote, to consider the Warden's memo the equivalent of formal recognition and to set about the business of preparing grievances. The committee informed Associate Warden Cansler that the grievances would be ready by 3:00 p. m. In the meantime, the Warden and his staff had become convinced, because of information received from various sources,[11] that the committee was stalling and purposely refusing to submit grievances in order to prolong the strike. At 4:00 p. m., Cansler went to the committee room but was advised by a committee member that the grievances would be ready in 10 minutes. After waiting 10 minutes, Cansler returned and was told that the committee would be finished in "just a little while." The committee requested that they be able to meet that evening, but Cansler informed them that the

Warden had to notify the Bureau of Prisons by 5:00 p. m. as to what action prison officials were taking to end the strike. When the committee apprised Cansler that the preparation of grievances would take at least two more hours, Cansler, convinced that this was merely another stalling tactic, terminated the meeting, disbanded the committee, and returned the committee members to segregation.[12]

The next day, Saturday, February 26, the Warden circulated a questionnaire asking each inmate to indicate whether he would return to work and stating that a negative answer might result in disciplinary action. By Monday, February 28, all but two inmates, plaintiffs Moore and McAllister, had agreed to return to work, and the work stoppage came to an end.

Shortly thereafter, all committee members (including all plaintiffs except for Moore and McAllister) were brought before the Adjustment Committee and charged with "Conduct Prejudicial to the Good Order, Security, and Safety of the Community and Security of Inmate Population." [13] The basis of such charges was the failure to present grievances. In addition, all plaintiffs who had allegedly made speeches on February 15 (Phillips, Jones, Alger, Irwin, and Mason) had previously been brought before the Adjustment Committee on charges of "Attempting to Incite a Work Stoppage." [14] Finally, Moore and McAllis-

11. Warden Alldredge testified that he had received information from inmates that grievances would never be presented as the plan was to organize a union and to participate in a nationwide federal prison work stoppage. The Warden further testified that he had received sealed letters from some members of the committee containing the same information.

12. The record is very conflicting with regard to how much progress the committee had actually made in the preparation of grievances. Some members of the first committee claimed that stencils containing the grievances had already been completed, while Associate Warden Cansler and other members of the committee testified that they did not

see any stencils. See, for example, DX–9 dated 2/25/72, containing no grievances; N.T. 337–38, making clear that the committee took no action on grievances until 2/25, insisting on prior recognition as the bargaining agent of the inmates.

13. The record indicates that the Adjustment Committee hearings of Phillips, Meyers, Jones, Irwin, and presumably Mason were held on March 6. Alger's hearing was held on March 1.

14. The record indicates that the Adjustment Committee hearings of Phillips and Irwin on this offense were held on February 22, while Jones' was held on February 29 and Alger's on March 1.

ter were brought before the Committee for refusal to sign the questionnaire circulated on February 26. The Adjustment Committee, of which Associate Warden Cansler was chairman, on the date of the hearings upheld all charges and referred them to the Good Time Forfeiture Board (hereinafter referred to as GTF Board) for action.

The cases of plaintiffs Phillips, Meyers, Jones, Alger, Mason and Irwin were thus referred to the GTF Board on March 1 and 6 on the charge of conduct prejudicial to the safety and security of the community for determination of the appropriate good time loss.[15] The Board found all men guilty on March 8 and 9 (except that it cleared Alger on the charge of attempting to incite a work stoppage), placed them in indefinite segregation, and recommended that their earned good time be forfeited.[16] The Warden forfeited only 30 days, however, and suspended the balance on the condition that the inmate not incur a major misconduct report for six months. Appeals were then taken to the General Counsel of the Bureau of Prisons. The General Counsel affirmed the disciplinary actions, but reduced the forfeiture to 15 days in the cases of Alger, Irwin and Mason.

■ The plaintiffs filed the instant suit on March 17, 1972, contending, *inter alia*, that (1) the disciplinary procedures afforded plaintiffs denied them procedural due process, and (2) the actions of the administration were so fundamentally unfair and the charges against the plaintiffs so fundamentally untrue as to constitute a violation of substantive due process.[17] After extensive hearings, including testimony by

both plaintiffs and prison officials, the district court ruled that plaintiffs were not entitled to relief and dismissed the complaint. Plaintiffs have appealed from this dismissal.

## II.

Plaintiffs' principal contention is that they were denied procedural due process in their prison disciplinary hearings. Plaintiffs contend that their disciplinary hearings did not comport with due process because they lacked four procedural safeguards essential to a fair hearing: (1) an impartial tribunal; (2) adequate notice; (3) the right to confront and cross-examine witnesses; and (4) the right to counsel. Before analyzing this contention, it is important to understand the exact nature of disciplinary proceedings in federal prisons.

The control and management of federal penal and correctional institutions is vested in the Attorney General, 18 U.S. C. § 4001, and responsibility for administration and supervision is delegated by statute to the Federal Bureau of Prisons, under the direction of the Attorney General, 18 U.S.C. § 4042. Disciplinary procedures at the Lewisburg Penitentiary follow the policies and standards of the Bureau of Prisons and occur at two levels, the Adjustment Committee and the GTF Board.

The Adjustment Committee hearings are low level disciplinary proceedings and lack a number of the procedural practices familiar in judicial proceedings. The normal procedure begins with the filing of a misconduct report by a correctional officer. This report is then investigated by another staff member, who may interview both the correctional

---

15. There is nothing in the record indicating whether the other first committee members, except for Scully and Hilty, were brought before the Good Time Forfeiture Board. Hilty and Scully withdrew as plaintiffs in this action before trial.

16. The Board recommended that Phillips lose 416 days of earned good time, Meyers 187 days, Jones 200 days, Alger 90 days, Irwin 482 days, and Mason 100 days.

17. Plaintiffs also contended that the punishments inflicted upon them and the conditions of segregation were so harsh and disproportionate to the nature of the alleged infractions as to constitute cruel and unusual punishment. We agree with the district court's rejection of this contention. We also note that the prayer contained in paragraph 27(d) has not been argued on appeal. See last sentence of the first column at 348 F. Supp. 819.

officer who filed the report and the inmate charged with the misconduct. The inmate is then brought before the Adjustment Committee,[18] which is composed of at least three members of the prison administration. The Committee's procedure in the instant case [19] was to call the inmate before it, advise him orally of the charges against him, and ask for his statement. The inmate was not allowed the assistance of counsel or a counsel substitute and was not allowed to confront and cross-examine witnesses. The Committee made its decision based upon the report of the correctional officer and the interrogation of the inmate. Upon finding the inmate guilty, the Committee placed the inmate in segregation and referred all charges to the GTF Board.

Violations considered more serious are referred by the Adjustment Committee to the GTF Board for consideration of forfeiting good time already earned or accrued to the date of the offense.[20] The proceeding before the GTF Board, which consists of three members, incorporates more procedural safeguards than does the Adjustment Committee proceeding.[21] At the hearing, the inmate is given a copy of the charges and is advised of the procedures to be followed. If the inmate admits the charges, he is given the opportunity to make a statement in mitigation. If he denies the charges, he is told that he can designate any representative of the institutional staff to represent him before the GTF Board. He is also given the opportunity to confer with the repre-

sentative. The evidence in support of the charges, usually in written form, is then considered by the GTF Board. After the evidence supporting the misconduct report is considered, the inmate or his representative is permitted to make a statement. The inmate can also request witnesses on his behalf and the chairman will call those witnesses, limited to the staff or inmates, who are available and who are considered by him to be necessary for the determination of the charges. Unavailable witnesses may be asked to submit written statements. After the hearing, a summary report of the GTF Board proceedings and its findings is prepared, and the Board makes a recommendation concerning any forfeiture action to the Warden, who reviews the report and orders any forfeiture he deems appropriate. Finally, the inmate is advised that he can appeal the Warden's decision to the Office of the General Counsel and Review of the Bureau of Prisons.

The plaintiffs contend that, although the above-described procedures were followed in the instant case, the hearings afforded plaintiffs did not comport with due process. Specifically, the plaintiffs claim that they were deprived of an impartial tribunal, adequate notice, the right to confront and cross-examine witnesses, and the right to counsel. Recently, in Braxton v. Carlson, 483 F.2d 933 (3d Cir. 1973), this court had occasion to consider similar contentions with respect to certain of the procedures followed in hearings before the Adjustment

18. If the investigating officer concludes that the offense is minor, then he may restrict the inmate's privileges for no more than two weeks and/or remove the inmate from honor quarters without referring the report to the Adjustment Committee.

19. The Adjustment Committee followed the procedures prescribed in Policy Statement on Inmate Discipline, 7400.5A. For a statement of the current procedures, see Policy Statement on Inmate Discipline, 7400.5B, which became effective on June 6, 1972, after the disciplinary action in the instant case.

20. Under 18 U.S.C. § 4161, an inmate who faithfully observes all rules and has not been subjected to punishment shall be entitled to a deduction from the term of his sentence of five to ten days for each month, depending upon the sentence received. 18 U.S.C. § 4165 provides that earned good time may be forfeited for committing any offense or violating the rules of the institution.

21. This procedure is prescribed in the Bureau of Prison's Policy Statement on Withholding, Forfeiture, and Restoration of Good Time, 7400.6A, adopted August 13, 1971.

Committee.[22] The plaintiffs in *Braxton* were six prisoners at Lewisburg who were variously disciplined by the Adjustment Committee. Before the Committee acted, the prisoners received oral notice of the charges, were informed of the substance of the evidence against them, were given an opportunity to respond, and were afforded a reasonable investigation into the facts by the Committee. Nevertheless, the prisoners contended that due process minimally required additional procedural safeguards: (1) written notice of the charges; (2) representation by counsel or a lay substitute; (3) confrontation and cross-examination of their accusers; (4) presentation of witnesses on their own behalf; and (5) written notice of the disciplinary committee's determination.

The court in *Braxton* rejected the above claims. Relying on the leading case of Sostre v. McGinnis, 442 F.2d 178, 198–199 (2d Cir. 1971), cert. denied sub nom., Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), which held that due process has been granted when the facts are rationally determined in a proceeding where the prisoner (1) is notified of the accusation and informed of the evidence against him, and (2) is afforded a reasonable opportunity to explain his actions,[23] the court held that the disciplinary hearings and procedures before the Adjustment Committee comported with due process. The court gave particular emphasis to the fact that the focus of the Adjustment Committee function is rehabilitative as well as punitive (see 483 F.2d at 939). The court recognized that the panoply of additional procedural safeguards requested by plaintiffs might improve the fact-finding function of the Adjustment Committee, but it concluded that "in light of the sensitive needs of prison discipline, limited resources, and the proceeding's related goal of rehabilitation, . . . due process . . . [does not mandate] their use." 483 F.2d at 941.

■ Based upon this court's decision in *Braxton,* we reject plaintiffs' contention that due process requires a full-blown inventory of procedural safeguards at Adjustment Committee hearings. Therefore, the issues which we must resolve on this appeal are (1) whether plaintiffs were denied due process at their GTF Board hearings, and (2) whether the Adjustment Committee hearings and procedures afforded plaintiffs in the instant case satisfied the minima of due process required in *Braxton.*

■ First we consider the threshold issue of whether due process applies to GTF Board disciplinary procedures at all.[24] In Morrissey v. Brewer, 408 U.S.

---

22. Until *Braxton,* this Circuit had only held that prisoners were entitled in certain circumstances to a hearing before receiving certain disciplinary action and had not determined the extent of procedural safeguards required by due process at such a hearing. See United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3d Cir. 1973); Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir. 1973); Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972).

23. In *Sostre,* the district court had imposed an extensive list of procedural requirements on New York State correctional authorities, holding that due process required that before a prisoner could be placed in punitive segregation, he was entitled to: written notice of the charges in advance of the hearing; a hearing before an impartial tribunal; the right to call witnesses and to confront and cross-examine adverse witnesses; the right to counsel or counsel substitute; and a written decision. See Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970), modified sub nom. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L. Ed.2d 254 (1972). The Second Circuit, sitting en banc, reversed the district court and rejected the extensive list of procedural safeguards, holding that minimal standards of due process require that the prisoner be "confronted with the accusation, informed of the evidence against him . . . and afforded a reasonable opportunity to explain his actions." 442 F.2d at 198.

24. In *Braxton,* the issue of whether due process requires hearings for revocation of good time was not resolved. The court noted: "The present case does not involve a question of whether due process hearings

471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the Supreme Court stated that "whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.'" The revocation of already accrued good time credits would appear to constitute a "grievous loss." The granting of good time credits directly affects the length of imprisonment by accelerating the time of release. The revocation of already accrued good time credits thus drastically affects the time when an inmate may enjoy liberty since it postpones the time of release.[25] Since we have held that due process applies to the disciplinary imposition of segregation by the Adjustment Committee,[26] it is, *a fortiori*, applicable to the GTF Board. Many courts which have considered this issue have held that due process applies to disciplinary procedures which involve the forfeiture of already accrued good time credits. See, *e. g.*, United States ex rel. Miller v. Twomey, 479 F.2d 701, 714–715 (7th Cir. 1973); Sands v. Wainwright, 357 F.Supp. 1062, 1082 (M.D.Fla.1973).

We thus hold that due process applies to disciplinary procedures of the GTF Board and proceed to consider plaintiffs' procedural due process contentions.

## A. IMPARTIAL TRIBUNAL

■ Plaintiffs contend that they were denied due process because they were not heard and disciplined by an impartial tribunal. Specifically, plaintiffs challenge the presence of Associate Warden Cansler on both the Adjustment Committee and GTF Board, particularly in light of the fact that Associate Warden Cansler was the presiding officer of both tribunals. We agree with plaintiffs' contention that Associate Warden Cansler's presence on these two disciplinary committees as to certain of the charges was improper on the facts of this case.

In Morrissey v. Brewer, 408 U.S. 471, 485–489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court recently underscored the importance of a "neutral and detached" decisionmaker in parole revocation hearings. In United States ex rel. Miller v. Twomey, 479 F.2d 701, 716 (7th Cir. 1973), the Seventh Circuit recently held that at a minimum due process requires an impartial factfinder in prison disciplinary matters involving serious punishments such as good time forfeiture. All other federal cases cited by counsel or which we have found addressing this issue in recent years have reached a similar conclusion.[27]

We have concluded that Associate Warden Cansler's presence on the disciplinary committees hearing the misconduct charges based on the failure to present grievances was improper as a result of his substantial personal involvement in the activities of the first committee, as reconstituted on February 23, which led to such misconduct charges. While his involvement with the first committee's activities was relatively insignificant during the early stages of the strike (February 15–17), he became directly and substantially involved during the critical last two days,

are required before prisoners are deprived of already accrued good time credits. That question is not raised because federal prison Adjustment Committees, as are involved here, cannot withdraw already earned good time credits." See Braxton v. Carlson, 483 F.2d 933, 938 n. 8 (3d Cir. 1973).

25. On the basis of the evidence adduced at the hearing, the district court observed that the revocation of good time results in two grave consequences to an inmate. Not only does it postpone the date of release but also an inmate is not considered to be in parole status (eligible for parole) if any amount of good time is forfeited and he is advised not to apply for parole unless it is restored. See 348 F.Supp. at 824.

26. See Braxton v. Carlson, *supra*, 483 F.2d at 936; *cf.* Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972).

27. See, *e. g.*, Sands v. Wainwright, 357 F. Supp. 1062, 1084–1085 (M.D.Fla.1973); United States ex rel. Neal v. Wolfe, 346 F. Supp. 569, 574–575 (E.D.Pa.1972); Landman v. Royster, 333 F.Supp. 621, 653 (E.D. Va.1971); Clutchette v. Procunier, 328 F. Supp. 767, 784 (N.D.Cal.1971).

February 24 and 25, after the committee was reconstituted for the purposes of submitting grievances. He dealt directly with the committee throughout the last two days of the work stoppage until he finally disbanded the committee, with the approval of the Warden, on February 25, after numerous unsuccessful attempts to obtain a list of grievances. In sum, Associate Warden Cansler was the one prison official who was constantly involved with the committee's activities on February 24 and 25, and this involvement made it improper for him to sit on the GTF Board in reviewing the charges, based on the failure to present grievances during this period.

Similarly, we have concluded that plaintiffs Meyers, Phillips, Jones, Alger, Irwin and Mason were denied an impartial judicial tribunal at their Adjustment Committee hearings of March 1 and 6 (date of Mason's hearing is not in record—see PX 32), where the charge of conduct prejudicial to the security and safety of the community was considered, because Cansler presided at those hearings. Although Braxton v. Carlson, *supra*, did not determine that an impartial tribunal was necessarily required for all Adjustment Committee hearings because of the rejection of the contention that the tribunal was impartial, the court stressed that no member of such Committee had any "personal involvement with any of the appellants because of their alleged infractions." In addition to the above-described contacts of Cansler with the reconstituted first committee on and after February 23, he had had some contact with the first committee from the start of the work stoppage, even though he apparently only relayed

demands and messages between the first committee and the Warden. He accompanied Warden Alldredge on February 16 to discuss with the committee the impasse over the demands. He disbanded the committee at 3:10 p. m. on February 16, when the request for the grievances was refused. He then made efforts to have a new committee elected, which efforts culminated in the disruption and dissolution of the new committee by one of the first committee members.

■ In holding that Cansler's presence on the disciplinary committees was improper, we emphasize that the requirement of an impartial tribunal prohibits only those officials who have a direct personal or otherwise substantal involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary body.[28] This would normally include only those such as the charging and the investigating staff officers who were directly involved in the incident. It would not include those who are only tangentially affected by the alleged misconduct, such as prison officials who may have some administrative connection with such misconduct prior to hearings.

Based on the above conclusion, we hold that plaintiffs (other than Buyse, Johnson, McAllister, Moore and Tucker) [28a] are entitled, with respect to the charge of "conduct prejudicial to the good order, security, and safety of the community and security of inmate population," to have (1) set aside the good time forfeitures as finally approved, even though they are minimal in amount,[29] (2) set aside the rulings of

---

**28.** In Morrissey v. Brewer, 408 U.S. 471, 486, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972), the Supreme Court stated that "there should be an uninvolved person." *See, e. g.*, The Emerging Rights of the Confined, South Carolina Department of Corrections, at 114 (1972) ; Model Rules and Regulations on Prisoners' Rights and Responsibilities, at 160 (1973) (West Pub. Co.).

**28a.** As noted below, Buyse Johnson and Tucker have failed to sustain their burden of

proof. McAllister and Moore were not charged with this offense. See also last sentence of this part A on page 307.

**29.** The initial forfeitures determined by the Board and the ultimate forfeitures made effective by action of the administrative process are respectively as follows: Phillips— 416 days, 30 days; Meyers—187 days, 30 days; Jones—200 days, 30 days; Alger—90 days, 15 days; Irvin—482 days, 15 days; Mason—100 days, 15 days.

misconduct and other disciplinary measures made by the Adjustment Committee on such charge, and (3) new hearings before properly constituted, impartial disciplinary committees on such charge. Because such new hearings might result in sanctions considerably in excess of those which are now effective,[30] we specify that each plaintiff charged with this offense (other than Johnson, Tucker and Buyse) must request such new hearings by notice delivered to the Warden, United States Northeastern Penitentiary, at Lewisburg, within 60 days after our decision becomes final.[30a] Otherwise, the minimal forfeitures in effect under the district court order of June 16, 1972, shall remain effective. No relief will be granted to plaintiffs Johnson, Tucker, and Buyse, who have failed to sustain their burden of proof, since no disciplinary records were introduced into evidence with respect to such plaintiffs and there is no record of exactly what penalties, if any, such plaintiffs incurred.[31] We also note that plaintiffs are not entitled to new disciplinary hearings on all other misconduct charges, since Associate Warden Cansler was not partial as to such charges.[32] For this reason,

McAllister and Moore, who were paroled in February 1973 without suffering any good time loss, are not entitled to relief on mootness grounds.

## B. NOTICE

■ Plaintiffs also contend that the failure of the prison officials to give them advance notice, either written or oral, of the charges against them before their Adjustment Committee hearings deprived them of due process. We disagree. In *Braxton,* this court rejected the prisoners' contention that due process required written notice of the charges, and held that due process required merely that the prisoners be given adequate notice.[33] 483 F.2d at 941–942. While the prisoners in *Braxton* were given prior oral notice of the charges, we do not find that the absence of prior formal oral notice in this case, given the emergency conditions which prevailed at the institution, constitutes a denial of due process. Each plaintiff in the present case was adequately informed of the charges against him at the commencement of the Adjustment Committee hearing and was afforded a reasonable opportunity at the hearing to explain his actions.[33a]

---

**30.** *Cf.* Chaffin v. Stynchcombe, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), and cases there cited.

**30a.** Such provision is appropriate (see 28 U.S.C. § 2106) because the notice of appeal was apparently filed under the mistaken impression that an effective class action was involved. See n. 3 at page 298.

**31.** In a letter dated October 17, 1973, counsel for plaintiffs informed this court that no disciplinary reports had been introduced in connection with these three plaintiffs.

**32.** See chart printed in the Appendix setting forth all other misconduct charges and disciplinary action as to which Cansler was not partial because such charges were based on events which occurred prior to February 23, when Cansler became the active representative of the Warden in dealing with the committee. Although new hearings are not required with respect to the other misconduct charges, it will be necessary in some cases to reconsider the appropriate sanctions for

such charges as are proved, since the forfeitures in the case where an inmate was found guilty of two or more charges, where one such charge involved conduct prejudicial to the safety and security of the prison community, were not allocated to specific charges but only generally on all the charges together.

**33.** The court reasoned that, while written notice would not necessarily alter the nature of the proceedings and impose any substantial additional burden upon the prison authorities, written notice would add little to the prisoner's ability to present his case to the Adjustment Committee.

**33a.** It should be noted that on June 6, 1972, the Bureau of Prisons issued a new *Policy Statement* on Inmate Discipline, No. 7400. 5B, which provides, *inter alia,* that the investigation of the charges and written notification to the inmates of the charges must be completed within 24 hours of placement in segregation.

## C. RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES

██ Plaintiffs also contend that they were denied due process at their GTF Board hearings since they were not afforded the opportunity to confront and cross-examine adverse witnesses. Because we have held that certain plaintiffs are entitled to new hearings before the GTF Board, we consider whether due process requires confrontation and cross-examination at such new hearings.[34]

The issue of whether inmates should be permitted to confront and cross-examine adverse witnesses at disciplinary hearings has been one of the most controversial issues in the field of prisoners' rights and has prompted substantial disagreement among the federal courts.

Many courts [35] and commentators,[36] in weighing the countervailing interest of the inmate and prison administration, have concluded that the prison's interest in security must yield to the inmate's right to confront and question his accusers.[37] Nevertheless, in light of the facts of the present case, we have concluded that the plaintiff inmates were not denied due process in being refused the right to confrontation and cross-examination. The factual circumstances of the charges made against the plaintiffs make it clear that the right to present witnesses in their own behalf afforded plaintiffs ample opportunity to present their defense or explain their conduct. The circumstances surrounding the failure to present grievances were largely, if not exclusively, within the knowledge of the committee members, and the plaintiffs were afforded the opportunity to present the committee members as witnesses in their behalf. Likewise, the plaintiffs charged with attempting to incite a work stoppage had

34. Under the Bureau of Prison's Policy Statement on Withholding, Forfeiture, and Restoration of Good Time, 7400.6A, the GTF Board afforded the plaintiffs in the instant case the following procedural safeguards: notice of the charges; an opportunity to respond; the right to representation by a staff representative of the inmate's choice; the right to call witnesses; a written summary of the proceedings; information in writing of the decision; and appeal to the Office of the General Counsel of the Bureau of Prisons. Thus, this case does not present a situation in which an inmate whose accrued good time has been revoked has been denied any or all of the above procedural safeguards. We therefore do not reach the issue of whether all, or less than all, of the above procedures are constitutionally required. However, in light of our decision in *Braxton, supra,* and in light of the fact that the GTF Board hearings involve more severe sanctions and do not have the rehabilitative orientation of Adjustment Committee hearings, the procedural safeguards required in *Braxton* would at least be minimal requirements for disciplinary action by the GTF Board.

35. *See, e. g.,* Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir., Opinion of Nov. 16, 1973); Sands v. Wainwright, 357 F.Supp. 1062, 1088 (M.D.Fla.1973); Colligan v. United States, 349 F.Supp. 1233, 1238 (E.D.Mich. 1972); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972); Stewart v. Jozwiak, 346 F.Supp. 1062, 1064 (E.D.Wis.1972); Landman v. Royster, 333 F.Supp. 621, 653 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767, 782–783 (N. D.Cal.1971); Morris v. Travisono, 310 F. Supp. 857, 873 (D.R.I.1970). *But see* Braxton v. Carlson, 483 F.2d 933, 941 (3d Cir. 1973); United States ex rel. Miller v. Twomey, 479 F.2d 701, 717 (7th Cir. 1973); Banks v. Norton, 346 F.Supp. 917, 919 (D.Conn.1972); Lathrop v. Brewer, 340 F.Supp. 873, 876–882 (S.D.Iowa 1972).

36. *See, e. g.,* The Emerging Rights of the Confined, South Carolina Department of Corrections, at 102–15 (1972); Model Rules and Regulations on Prisoners' Rights and Responsibilities 165–67 (1973) (West Pub. Co.); Milleman, Prison Disciplinary Hearings and Procedural Due Process: The Requirement of a Full Administrative Hearing, 31 Md.L.Rev. 27, 51 (1971). But see A Model Act for the Protection of Rights of Prisoners 17 (1972) (National Council on Crime and Delinquency).

37. A concern was expressed by one district court that:
"Cross-examination of a superintendent, a guard, or a fellow prisoner would almost inevitably go beyond the usual consequences of such probing in a court. It would tend to place the prisoner on a level with the prison official. Such equality is not appropriate in prison."
See Nolan v. Scafati, 306 F.Supp. 1 (D. Mass.1969), vacated & remanded, 430 F.2d 548 (1st Cir. 1970).

the opportunity to call as witnesses in their behalf observers of the speeches on February 15, the first day of the work stoppage. This limited right to present and examine witnesses afforded plaintiffs the opportunity to provide sufficient testimony to enable the fact-finder to make a rational determination of the facts. Accordingly, we cannot say on this record that the plaintiffs were denied due process in not being allowed to confront and cross-examine adverse witnesses.[38] In reaching this conclusion, we reiterate the admonition of the court in Braxton v. Carlson that:

> "Our expertise is limited; our knowledge of the extensive day to day prison problems is minimal; our ability to foresee the effect of procedural changes on treatment, rehabilitation and programmatic process is imperfect." 483 F.2d at 942.

The Seventh Circuit recently manifested a similar reluctance to impose affirmative action upon prison administrators unless absolutely necessary:

> "The judiciary cannot avoid its ultimate responsibility for interpreting the constitutional requirements of due process. Certainly that responsibility cannot be delegated to prison authorities. But neither should their expertise nor their assistance in accurately identifying and evaluating the interests at stake be ignored. These cases represent a stage in the development of an extremely important phase of constitutional law. It is appropriate that the development proceed with full deliberation."

United States ex rel. Miller v. Twomey, 479 F.2d 701, 719 (7th Cir. 1973).

### D. RIGHT TO COUNSEL

 Plaintiffs also contend that the GTF Board hearings were unconstitutional in that they were denied the right to counsel at such hearings. We reject this contention. Neither the prison officials nor the inmates have legal counsel at such hearings. The need for legal skills is less acute at a prison hearing, where there are no formal evidentiary rules, and the interjection of counsel in prison disciplinary hearings would severely conflict with and undermine the prison administration's interest in summary disposition of disciplinary matters. See Sostre v. McGinnis, *supra*, 442 F.2d at 196. We note that the Bureau of Prisons Policy Statement on Good Time Forfeiture Board procedures affords inmates the right to be represented by a staff member of their choice, and that plaintiffs in the instant case did have the benefit of a counsel substitute.

### III.

Plaintiffs' final contention is that the prison rule under which the plaintiff members of the first committee were disciplined, namely "conduct prejudicial to the good order, security and safety of the community and the security of inmate population," is unconstitutionally vague since it afforded plaintiffs no notice that failure to present grievances constituted a punishable offense. The plaintiffs rely heavily upon Levy v. Parker, 478 F.2d 772 (3d Cir. 1973), cert. granted, 414 U.S. 973, 94 S.Ct. 286, 38 L.Ed.2d 216 (1973), in which this court held unconstitutional on vagueness grounds Article 134 of the Uniform Code of Military Justice which made punishable "disorders and neglects to the prejudice of good order and discipline in the armed forces." Defendants contend that maximum security prisons such as Lewisburg, housing dangerous inmates, present special problems of safety and discipline which require that the vagueness doctrine not be applied to prison regulations.

---

38. It may be that a future case will present a factual situation in which the inmate's inability to confront and cross-examine adverse witnesses before the GTF Board renders his opportunity to present a defense meaningless and in which we may conclude that the prison's interest must yield to the inmate's interest. Upon the record in this case, however, we find no denial of due process in this regard.

At the outset, we note that there is a substantial difference between the language of Article 134 and the language of the prison regulation challenged by plaintiffs. While Article 134 speaks only generally of good order and discipline, without qualifying such terms, the prison regulation speaks also specifically of safety and security, thus making clear to inmates and limiting the nature of the good order to which the regulation applies.

Due process undoubtedly requires certain minimal standards of specificity in prison regulations, but we reject the view that the degree of specificity required of such regulations is as strict in every instance as that required of ordinary criminal sanctions. This results from the fundamental difference between normal society and prison society. The maintenance of strict security and discipline, with its unfortunate but unavoidable circumscription of an inmate's freedom to act, is essential to safe and efficient prison administration. See, for example, Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970); Long v. Parker, 390 F.2d 816 (3d Cir. 1968); Sostre v. McGinnes, 334 F.2d 906, 908 (2d Cir. 1964). As such, it is nearly impossible for prison authorities to anticipate, through a narrowly drawn regulation, every conceivable form of misconduct which threatens prison security. The instant case offers a convenient example of the type of misconduct—i.e., failure to present grievances during a work stoppage where such failure prolongs the stoppage—which form of misconduct could not reasonably be anticipated by the prison administration but which the inmates should clearly have recognized as constituting dangerous and unacceptable prison conduct. Certainly, prison authorities could, and did in fact, anticipate the possibility of a work stoppage, and accordingly they charged those inmates who made speeches on February 15 not with some vague offense but with the specific offense of "attempting to incite a work stoppage." Prison officials could not anticipate, however, that the focal point of the work stoppage, and indeed the key to breaking the deadlock, would be the presentation of inmate grievances.[39] Thus, when it became apparent that the first committee was deliberately stalling in order to prolong the strike, the prison officials could not be said to have acted without sufficient grounds in charging the committee members, after prior warning, with "conduct prejudicial to the good order, safety, and security of the inmate population" for their failure to present grievances where such conduct clearly posed a threat to the security of the prison. We emphasize that the inmates clearly should have realized that their conduct in creating a total work stoppage established a dangerous situation and that such conduct would be punishable.

In Landman v. Royster, 333 F.Supp. 621, 655–656 (E.D.Va.1971), the district court recognized the considerations which countervail strict application of the vagueness doctrine to prison regulations:

"1. Life is complex in prison as well as outside, and all forms of misbehavior cannot be anticipated. Some may go unpunished for want of a rule.

"2. Administrators ought not to be put to the choice of foregoing discipline in such cases or resorting to the ordinary criminal process, for flexibility may work to the benefit of the institution and the inmates as well.

"3. Legalistic wrangling over whether a rule was broken may visibly undermine the administration's position of total authority, necessary for security's sake.

---

39. Warden Alldredge testified that he had never before prepared a charge based on failure to present grievances and probably would never do so again. See N.T. at 671. This statement indicates that this type of misconduct simply could not be anticipated through a specific regulation because of its unique nature. Plaintiffs, being members of the reconstituted first committee, were warned on February 16 (p. 299 above) and February 24 (p. 301 above) of the importance of presenting grievances promptly.

"4. Prisoners, unlike free men, must well know that they are considered potentially dangerous men and must expect to be highly regimented. In such cases the law requires less in the way of notice, and places a greater burden on the individual to make inquiry or ask permission before acting."

Based on these considerations, balanced against the considerations in favor of applying the vagueness doctrine,[40] the district court in *Landman* concluded that:

"The objections to the application of some vagueness principle may all be met simply by relaxing the standard somewhat in deference to the state's legitimate needs, rather than by abandoning it. . . ." 333 F. Supp. at 656.

We accept the approach of the *Landman* court with respect to the application of the vagueness doctrine to prison regulations.

It should be emphasized that our ruling that vagueness principles must be applied in light of the legitimate needs of prison administration does not confer upon prison officials a license to punish inmates pursuant to broad, sweeping regulations. Many types of prison conduct which are deemed undesirable or dangerous may be foreseen, and due process may well require that prison officials publish clearly drawn regulations specifying those types of proscribed conduct which can be reasonably anticipated. This is particularly important with respect to conduct which might otherwise seem innocent to an inmate.[40a]

We have concluded that the plaintiffs had sufficient notice, under the circumstances of the work stoppage, that failure to pursue the presentation of grievances in good faith might result in disciplinary sanctions and that, therefore, there was no violation of due process in this case. The findings of the district court make clear that the prison authorities were repeatedly asking the committee members for a statement of grievances from the time the work stoppage started on February 15. Plaintiffs argue that the Warden's promise of no reprisals on February 16 led them to believe that their committee work would not result in disciplinary measures. However, as the district court found, this promise was qualified by the Warden's statement that "there would be no reprisals as long as they functioned as a committee in good faith and did not commit an illegal act." Plaintiffs also contend that the Warden's memorandum on February 25, stating that they could work "round the clock" on the preparation of grievances, further misled them into believing that no reprisals would be made. Again, however, the memorandum was qualified by the Warden's statement that he was convinced that they did not intend to submit grievances but that he would allow them to continue in the hope of resolving the conflict.[41]

---

40. See 333 F.Supp. at 655.

40a. We note that, for example, the Bureau of Prisons Policy Statement on Inmate Discipline 7400.5B, which specifies prohibited acts in federal penal and correctional institutions, lists among the proscribed activities: "possession of money or currency, unless pecifically authorized" (# 205) ; "possessing unauthorized *clothing*" (# 210) ; "the loaning of property or anything of value for profit or increased return" (# 207) ; and "tattooing or self-mutilation" (# 652).

41. The Warden's memo contained the following qualifying language:
"You have almost convinced me that as a group you do not and never did intend to present the grievance of the inmate population for me and other unnamed officials consideration. I believe instead your intent has been to take charge of the operation of the institution and dictate policy and procedure.

"Despite this opinion, I have permitted you to assemble the population on at least two occasions to develop grievances, use the Public Address System to report to the population and permitted you to circulate among the population for their views, all without success. . . .

"All of this has produced nothing but the same pre-conditions using different words. . . ."

In addition, the plaintiff committee members must have known from the course of events that the key factor in resolving the work stoppage was the identification and presentation of grievances. This is indicated by the fact that some of the plaintiff committee members were released from segregation on February 24, the 10th day of the strike, for the express and sole purpose of presenting grievances so that the general population would agree to return to work. This fact, coupled with the fact that the committee was disbanded and the plaintiffs placed in segregation on February 16 for precisely the reason that they refused to prepare grievances, makes clear that plaintiffs had sufficient notice that a bad faith failure to prepare grievances would result in disciplinary measures. In so concluding, we are necessarily mindful of the fact that this work stoppage, as any such stoppage in a maximum security prison of over 1000 inmates, was a very serious and dangerous situation which had the potential of suddenly erupting into violence. The prison administration was commendably patient with the inmates' demand to present grievances and it must have been obvious to the plaintiff committee members (particularly in light of the Warden's insistence on the presentation of grievances) that the administration expected the same good faith effort from them which it had manifested throughout the strike.

We cannot agree with plaintiffs' contention that as a matter of law there was no evidence to support the charge that the committee members deliberately failed to present grievances. Plaintiffs concede that the district court cannot sit as a fact-finder in prison disciplinary cases and that it is limited to ascertaining only whether there is any evidence to support the charge. See Gregory v. City of Chicago, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). Having reviewed the record, we conclude that there was evidence to support the charge.

IV.

For the foregoing reasons, the judgment of the district court will be reversed and the case will be remanded to the district court for action consistent with the rulings at pages 306–307 above and with this opinion.