**UNITED STATES of America ex rel. Gaylord NEAL**

v.

**Clarence WOLFE, Deputy Superintendent; Clayton Ruth, Major of the Guards.**

**Civ. A. No. 40870.**

United States District Court, E. D. Pennsylvania.

Aug. 7, 1972.

---

570

Ralph Spritzer, Univ. of Pa., Professor of Law, Sami Shad, Robert Heim, Univ. of Pa., law students, Philadelphia, Pa., for plaintiff.

Michael Luber, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

MASTERSON, District Judge.

Plaintiff has brought this action under 42 U.S.C. § 1983 [1] to recover $10,489 damages for violation of his constitutional right to due process of law by defendants, Clarence Wolfe, Deputy Superintendent of the State Correctional Institution at Graterford and Clayton Ruth, Major of the Guards at Graterford. The issue before the court is whether or not plaintiff was afforded procedural due process by the prison authorities when he was subjected to institutional punishment. This case was

1. Civil Rights Act of 1871.

tried before the court without a jury on March 29, 1972, and we have resolved the issue in favor of the plaintiff.

## FINDINGS OF FACT

1. In May, 1964, Gaylord Neal, plaintiff, was committed to the State Correctional Institution at Graterford on two concurrent sentences of five to twenty years for separate counts of armed robbery and aggravated robbery. (N.T. 2).

2. On August 30, 1964, the plaintiff was apprehended by one Sergeant Zanesky, a guard at the Graterford Institution, for being in possession of a piece of beaverboard which is used for construction purposes in the institution. The beaverboard, which had been converted into a checker board by another inmate, was being used by plaintiff for his personal enjoyment. Sergeant Zanesky reported this infraction of prison rules to the Disciplinary Board of the Institution. (N.T. 3).

3. Plaintiff was advised of the charge against him and accorded a hearing before the Prison Disciplinary Board. Major Clayton Ruth presided over that hearing. (N.T. 11). The Board authorized the deduction of $1.00 from plaintiff's prison account to compensate the state for the conversion of its property. (N.T. 3).

4. On June 23, 1966, plaintiff decided to appeal the action of the Disciplinary Board. He was motivated by a desire to remove any blemish that might impede commutation of his sentence, early parole, or bail pending appeal. He was also concerned that his institutional conviction might adversely influence his opportunity to obtain a better job position within the institution. (N.T. 12, 14).

5. On June 23, 1966, plaintiff submitted an institutional request form to Superintendent Rundle challenging the legitimacy of the 1964 fine imposed by the Disciplinary Board. The request read as follows:

"I would like to have my institutional record expunged. . . . The Disciplinary Board, scoundrels that they are, sat upon my case, and with a false cloak of judicial authority, confiscated over 6 days kitchen pay from me.

Is this the origination (sic) of the term, 'It takes a thief to catch a thief'?

I would sincerely appreciate consideration about any change that could be made in my record."

6. Approximately one hour after submission of this request, plaintiff was locked in his cell and not permitted to join the prison population. (N.T. 17).

7. About an hour after that plaintiff was brought before Mr. Wolfe in Wolfe's office. Defendant Clayton Ruth and the block sergeant were the only other individuals present. (N.T. 17–18, 46).

8. Mr. Wolfe inquired only whether plaintiff had written the statements on the request form to which plaintiff responded affirmatively. Without further elaboration or explanation, Mr. Wolfe ordered that plaintiff be taken out. Plaintiff was then taken to the maximum security block (solitary confinement). (N.T. 17).

9. Mr. Wolfe afforded plaintiff no opportunity to explain his remarks. (N.T. 19, 45, 46). Nor was plaintiff informed of the charges against him or brought before the Disciplinary Board prior to being placed in solitary confinement. (N.T. 18).

10. Plaintiff was not afforded an opportunity to speak to anyone else about the action taken against him prior to his confinement in the maximum security block. (N.T. 19).

11. In an annotation on plaintiff's request slip, Mr. Wolfe indicated that he resented being called a scoundrel and thief. See Inmate's Request to Staff Member, JBC–135A, dated June 23, 1966. Mr. Wolfe, however, had not sat upon the Board which fined plaintiff in 1964.

12. Upon arriving at maximum security, plaintiff was stripped of his clothes and left naked for a period of approximately nine hours. There was no light in his cell. Bedding for the steel shelf that served as a bed was supplied at night and removed in the morning. (N.T. 21, 22).

13. For the first three days of his confinement, plaintiff was fed a regular noon meal and a reduced diet for breakfast and supper. (Exhibit B). Plaintiff received no exercise privileges and no shower privileges. (N.T. 24, 54, 55).

14. Plaintiff was not permitted any reading material other than a bible. He was not allowed visitors, he could not work and was not permitted to converse with other prisoners and he had no commissary privileges. (N.T. 25, 26).

15. Plaintiff was confined in maximum security from June 23, 1966 to July 1, 1966, but he was never advised when he would be released. (N.T. 26).

16. On July 1, 1966 (Exhibit D) plaintiff was brought before the Disciplinary Board, presided over by Mr. Wolfe. He was then released from maximum security. (N.T. 26, 52).

17. Upon release from maximum security, plaintiff was transferred from his job in the weave shop to the position of block runner. (N.T. 26, 27).

18. The position in the weave shop is one earned through good performance. (N.T. 89).

19. Plaintiff instituted the instant action on August 2, 1966 after having been released from maximum security. (N.T. 29).

20. After being released from maximum security and until the time of his transfer from Graterford, plaintiff experienced a number of difficulties with Mr. Wolfe relating to his receipt of legal materials in the mail. (N.T. 72–74).

21. On January 9, 1967, plaintiff attempted to serve Interrogatories upon Superintendent Rundle, the latter having answered plaintiff's complaint against the named defendants. Mr. Rundle refused to accept the Interrogatories. (N.T. 31).

22. Plaintiff was not permitted to serve the Interrogatories upon the defendants, and mailed them instead on the same day, January 9, 1967. (Exhibit C) (N.T. 32).

23. On January 16, 1967, pursuant to the express request of Mr. Wolfe, a reclassification summary and reclassification transfer petition were prepared. The reclassification was designated as being "demotional" and transfer was requested to the State Correctional Institution at Philadelphia. The security reclassification selected was maximum. (Exhibit D) (N.T. 34, 35).

24. On February 2, 1967 plaintiff was again committed to solitary confinement without any notice or explanation of the reason therefor. (N.T. 36, 37, 39).

25. On February 3, 1967, plaintiff was transferred to the State Correctional Institution for Philadelphia and segregated from the general prison population. He was not advised of the reason for his transfer or told when he could expect to be released from segregation. (N.T. 37, 86, 94).

26. Prisoners so segregated do not have the same privileges accorded other prisoners on other cell blocks and experience significant restrictions on their liberties. (N.T. 37, 38, 92, 93).

27. Plaintiff was released after seven days of segregation on February 9, 1967 upon review of his record and a vote by the staff at the State Correctional Institution, Philadelphia. (Defendant Exhibit 2) (N.T. 87).

28. The vote in favor of releasing plaintiff to the prison population was six to one, the one dissenting vote being based upon the fact that plaintiff had been received in a demotional punitive status. (N.T. 90).

29. Plaintiff was subsequently assigned to the kitchen and later entered the barber training program while at

the State Correctional Institution, Philadelphia. (N.T. 74).

30. Plaintiff was released on parole on April 18, 1969. (N.T. 81).

## CONCLUSIONS OF LAW

The first issue which must be resolved is whether the federal courts can and should intervene in matters of penal administration or must defer to the discretionary authority of prison officials. Historically, the courts have been hesitant to intervene in the internal operation of state penal facilities. Childs v. Pegelow, 321 F.2d 487, 489 (4th Cir. 1963); Roberts v. Pegelow, 313 F.2d 548, 551 (4th Cir. 1963); Sewell v. Pegelow, 291 F.2d 196, 197 (4th Cir. 1961). Because prison officials have expertise in the maintenance and proper functioning of correctional institutions, it has been argued that they should be permitted wide discretion in promulgating rules to regulate the behavior of the inmates. McCloskey v. Maryland, 337 F.2d 72, 74 (4th Cir. 1964). This is in accord with theories of criminal punishment which hold that incarceration involves a consequent loss or limitation of rights and privileges enjoyed by citizens of a free society.[2] According to the historical view the courts may not inquire into the discretionary authority of penal officials unless the inmate's "exercise of a constitutional right is denied without semblance of justification arising out of the necessity to preserve order and discipline within the prison . . ." 337 F.2d at 74. See also Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961).

Despite the historical reluctance of the courts to intervene in matters of prison administration, recent cases support the proposition that federal courts may inquire into the restriction of an inmate's constitutional rights by prison officials.

"There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated." Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L. Ed.2d 718 (1969). See also McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970).

■ The courts have been sensitive to certain complaints and have intervened in cases involving alleged infringement of inmates' rights to freedom of religion,[3] freedom of speech and association,[4] and freedom from racial segregation.[5] Such intervention has been grounded upon the argument that unless prison officials can show a compelling need to restrict a convict's constitutional rights, then denial of these basic rights is invalid. Landman v. Royster, 333 F.Supp. 621, 624 (E.D.Va. 1971). Judicial intervention is not barred, therefore, where the exercise of administrative authority involves a deprivation of constitutional rights. See, e. g., Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966).

■ It is now well settled that prisoners retain their constitutional right to due process of law guaranteed by the Fifth and Fourteenth Amendments. See

---

2. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1947).

3. See, e. g., Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971); Wilson v. Prasse, 463 F.2d 109 (3rd Cir. 1972).

4. See, e. g., Carothers v. Follette, 314 F. Supp. 1014 (S.D.N.Y.1970).

5. See, e. g., Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). See also Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966), in which the state was enjoined from imposing solitary confinement conditions deemed violative of the eighth amendment.

Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969).

■ In the past prison administrators have justified the restriction or withdrawal of certain benefits during incarceration according to the so-called right-privilege distinction. According to this rationale, the withdrawal of a particular privilege does not constitute "punishment." Instead, the withdrawal or denial falls within the ambit of "maintenance of control" and "disciplinary discretion," areas traditionally thought to be within the exclusive control of prison officials. "Presumably the consequence of labeling a deprivation a matter of control is that it may be imposed without procedural preliminaries." Landman v. Royster, 333 F. Supp. at 645. We reject this distinction. Maintenance of control and security may not be used to justify the deprivation of basic human rights unless in pursuance of valid objectives and provided that the rudiments of due process are first observed.

In adopting this view, we are in full accord with Judge Merhige's able and comprehensive opinion in Landman v. Royster.

"Deprivations of benefits of various sorts may be used so long as they are related to some * * * [valid penal] objective and substantial deprivations are administered with due process. 'Security' or 'rehabilitation' are not shibboleths to justify any treatment." 333 F.Supp. at 645.

■ If prison officials are to provide inmates of state penal facilities with the rudiments of procedural due process prior to exercise of disciplinary control, then what minimal elements are essential to satisfy this constitutional guarantee? Obviously, the full panoply of protections provided a defendant in a criminal trial cannot be applied to internal prison adjudications. The state has an interest in acting quickly to stem disorders and the content of procedural due process must be somewhat limited so as to avoid unnecessary burden upon the administrative task. However, the traditional benchmarks of a fair procedure —advance notice of charges, a hearing before an impartial tribunal, and the opportunity to call defense witnesses and cross-examine adverse witnesses must be observed where the disciplinary hearing may result in solitary confinement, extension of sentence, or loss of privileges. "Although a prisoner does not possess all of the rights of an ordinary citizen he is still entitled to procedural due process commensurate with the practical problems faced in prison life." Carothers v. Follette, 314 F.Supp. 1014, 1028 (S.D.N.Y.1970).

The most minimal elements of due process are not empty, meaningless phrases which can be disregarded within a prison society merely on the pretext of administrative expediency. First, notice of the charge of misconduct is an essential element of due process. See Goldberg v. Kelly, 397 U.S. 254, 267–268, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). It is essential that the prisoner be made aware that proceedings have been initiated against him and that he have knowledge of the rule alleged to have been broken. "Only with written notice can a prisoner prepare to meet claims and insist that the hearing be kept within bounds." Landman v. Royster, 333 F.Supp. at 653. See also In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966).

Second, "[t]he fundamental requisite of due process of law is the opportunity to be heard." Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). There must be a hearing. "Disposition of charges on the basis of written reports is insufficient." Landman v. Royster, 333 F.Supp. at 653; Goldberg v. Kelly, 397 U.S. at 269, 90 S. Ct. 1011.

Third, due process requires that the accused be given an opportunity to call friendly witnesses and to confront and cross-examine adverse witnesses. Fact finding is not complete unless illuminat-

ed by the testimony of witnesses called by both adversaries. An adverse witness' representation of the facts cannot be challenged unless he is confronted by the accused. The Sixth Amendment demands no less.

Fourth, an unbiased fact finder is an indispensable element of procedural due process. Goldberg v. Kelly, 397 U.S. at 269, 90 S.Ct. 1011. Any previous involvement with the matter under consideration should bar an individual from sitting in judgment. This would include those officials who reported a violation or initiated charges against the accused. See Escalera v. New York City Housing Authority, 425 F.2d 853, 863 (2d Cir. 1970).

These minimum due process standards are applicable whenever the prisoner may lose privileges such as a preferred job status acquired through good behavior or may be transferred from the general prison population to solitary confinement or maximum security cell blocks. Because punitive incarceration transfers have been subject to much arbitrary and capricious action by prison officials, we will examine disciplinary confinement more closely here.

█ We note that although solitary confinement is not an unconstitutional form of punishment,[6] it is still sufficiently punitive to warrant strict observance of due process guarantees prior to its use. Solitary confinement, or segregation from the rest of the prison population, is harsh punishment with ramifications that are more far-reaching than even the demoralizing and dehumanizing physical impact of the segregated environment.

"1. Segregation demonstrates an inability to adjust to the institution, and will certainly be a factor taken into consideration any time the man is reclassified.

2. It could affect his security status, and would certainly be a factor taken into consideration in determining whether a furlough should be granted, and if so, whether the furlough would be 'escorted' or 'unescorted.'

3. Segregation status would always be an additional factor taken into consideration by the Parole Board, especially if the inmate's file reflected that the action had been taken within a short period of time before the parole hearing.

4. Prison is a community, and just like in any other community the members of that community, staff and prisoners alike, attach a stigma to 'jail.' Segregation is the prison community's jail.

5. Segregation is confinement in close quarters, regardless of what steps are taken to improve conditions. To a man whose liberty has already been substantially curtailed, the act of placing him in a further restricted environment is a substantial invasion of his liberty." Kraft, Prison Disciplinary Practices and Procedures: Is Due Process Provided? 47 N.D.L. Rev. 9, 44 (1970).

Following reception of plaintiff's institutional request, Deputy Superintendent Wolfe ordered plaintiff taken to the maximum security block where he was segregated from the prison population for a period of eight days. The disciplinary action meted out by Defendant Wolfe was not preceded by any of the elements of due process which we have enumerated. Plaintiff was not provided with advance notice of charges; he was merely brought before defendant Wolfe and asked whether he had written the statements on the request form. Nor was plaintiff given a hearing before an impartial tribunal. It is apparent from Wolfe's annotation on plaintiff's request slip that he mistakenly believed that plaintiff's comments had been directed at him personally. Defendant Wolfe was not, therefore, in a position to act as an impartial trier of fact. Nor can it be said that plaintiff had an opportunity to call and cross-examine witnesses and

6. Graham v. Willingham, 384 F.2d 367, 368 (10th Cir. 1967).

conduct a reasonable defense. Defendant afforded plaintiff no opportunity to explain his remarks. Upon ascertaining that plaintiff had written the statements, he ordered that Neal be taken out.

Upon arriving at maximum security, plaintiff had not been told why he was being confined nor was he ever informed of how long he would remain in segregation.

Plaintiff was again committed to solitary confinement on February 2, 1967 just prior to his transfer from Graterford to the State Correctional Institution in Philadelphia. Although plaintiff was segregated for only a day, he was never informed of the reason for his confinement. His transfer to the Philadelphia institution was prompted by defendant Wolfe's request for a reclassification and transfer petition. The reclassification was designated as being "demotional" and the security reclassification selected was maximium. Plaintiff was not given any notice of the request for such a petition, nor was he given a hearing or any opportunity to refute the charges that prompted the transfer petition.

Upon his arrival at the State Correctional Institution on February 3, 1967, plaintiff was again segregated from the general prison population. The rudiments of due process were not observed in this instance. Plaintiff was never accorded a hearing or told when he could expect to be released from solitary confinement. After seven days of segregation, plaintiff was released into the prison population on February 9, 1967. This action was taken pursuant to a review of plaintiff's record and a vote by the institutional staff. Plaintiff, however, had no knowledge of this review of his record and was provided no opportunity to defend himself.

■■ We hold that the demotional disciplinary transfer of plaintiff Neal from Graterford to Philadelphia and his accompanying isolation in a maximum security status was in violation of his constitutional right to due process of law. Although Pennsylvania law permits the transfer of any convict from one state correctional institution to another, 61 P.S. § 78 (1964), it does not contemplate or permit the use of the transfer provision by prison officials for punitive purposes. While administrative transfers are immune from constitutional attack, demotional disciplinary transfers have a severe and substantial impact upon convicts' rights to due process. Such transfers are constitutionally invalid unless accompanied by the elements of due process discussed herein.

■ The last question we must resolve is the issue of damages. Plaintiff is authorized by 42 U.S.C. § 1983 to recover damages against state officials for violation of his constitutional rights "under color" of state law. Sostre v. Rockefeller, 312 F.Supp. 863, 885 (S.D. N.Y.1970) ; aff'd in part, rev'd in part sub. nom. Sostre v. McGinnis, 442 F.2d 178, 204–205 (2d Cir. 1971). The evidence shows that plaintiff was subjected to punitive segregation without due process of law for a period of sixteen days. The court awards him $25.00 per day for every day spent in solitary confinement, or a total of $400 compensatory damages. We also award plaintiff lost wages, at $0.60 per day, from change in job status upon release from solitary confinement on July 1, 1966 until reassigned at the State Correctional Institution, Philadelphia (191 days), or a total of $114.60. Compensatory damages are governed in this case by federal standards. Basista v. Weir, 340 F.2d 74, 87 (3 Cir. 1965).

We have reviewed the record and find that plaintiff's solitary confinement, albeit wrongful, does not warrant the exaction of punitive damages.