Courtland PITTS, Plaintiff,

v.

Wilber KEE, Defendant.

Civ. A. No. 79–430.

United States District Court,
D. Delaware.

April 1, 1981.

Courtland Pitts, pro se.

John J. Polk, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge.

This is a civil rights action in which Courtland Pitts, a prisoner at the Delaware Correctional Center ("DCC" or "the institution"), challenges several aspects of his confinement to the isolation section of the institution in August of 1979. He asserts that his transfer to that section and the subsequent failure of prison authorities to afford him a hearing within a reasonable time after that transfer violated his right to due process under the Fourteenth Amendment; he further alleges that the conditions of solitary confinement during the period he was confined there were so barbaric as to constitute cruel and unusual punishment.[1] He seeks compensatory and punitive damages against each defendant, and an injunction against similar treatment in the future. This opinion constitutes the Court's findings of fact and conclusions of law after a two day trial.

On August 2, 1979, there was a disturbance in C Dormitory of the Medium Security Section of DCC. The evidence indicates that a dispute between black and white inmates led to a riot in this sixty man dormitory. Some thirty guards were called to restore order. Captain James Williams ordered the guards to remove all chairs, locker boxes and any other items which could be swung or hurled. The inmates were told to stand by their beds and remain quiet. While the guards were carrying out their directive, Pitts asked Captain Williams why he was removing his locker box. Williams told Pitts to be quiet and remain by his bed. Pitts continued to protest the removal of his foot locker in a belligerent manner and Captain Williams ordered him removed from the dormitory to the control center. A second inmate, Clarence Wells, was also removed to the control center when he refused to stay by his bed and remain silent. Pitts and Wells were handcuffed and placed in a locked visitor's room. They remained there for approximately three hours while Captain Williams completed the task of restoring order and conducted a preliminary investigation of the disturbance. Upon completion of his inves-

---

1. Pitts also makes the charge that his confinement in the isolation section was intended to, and had the effect of, depriving him of access to the courts. I find no factual basis for this charge.

tigation, Captain Williams ordered that both inmates be transferred to the isolation section of the institution under Rule 31 of the Institution's rules.[2] He did so in the belief that they had been principal instigators of the riot. Captain Williams delivered copies of the Rule 31 notice to Pitts and Wells and filed the originals so that those responsible for following up on the matter would be aware of what he had done. The notice read in pertinent part:

> You are being transferred to Maximum Isolation for Inciting a Riot and Creating a Disturbance; pending further investigation into these charges.
>
> *Plaintiff's Exhibit 1* ("PX–1").

This is where Captain Williams' role ended.

▮ I can find no fault with Captain Williams' actions. C Dorm was in disarray following the riot, and the atmosphere remained tense. A confrontation of the kind Pitts insisted upon could easily have sparked renewed violence. It was in these circumstances that the decision was made to immediately remove Pitts from the dorm. Then, having concluded on the basis of his preliminary investigation that Pitts had been an instigator, Captain Williams was clearly warranted in deciding not to reintroduce him into the dorm and to segregate him from other inmates pending further investigation and appropriate proceedings.[3] Finally, given the exigence of the situation, and the need for further investigation, the failure to afford plaintiff Pitts a hearing prior to his transfer to the isolation section did not offend due process. *LaBatt v. Twomey*, 513 F.2d 641 (7th Cir. 1975); *Smith & Hoskins v. Bracy*, C.A. 79–591 (D.Del. October 14, 1980). Based on these findings, I directed a verdict in favor of Captain Williams at the close of the plaintiff's case.

▮ After Captain Williams issued the Rule 31 order, Captain Kee took control of the case and began a more complete investigation. His investigation lasted from August 2 until August 9, beginning with a thirty-six hour intensive examination of numerous inmates involved in the riot. During this investigation, Kee did not speak with Pitts even though Pitts wrote him a letter asking for the opportunity to be heard. Kee wrote a report, dated August 9, 1979, which includes the following account of the incident:

> My investigation revealed that the incident began as a result of several men having wine and others wanting it. Inmate Cecil Brown saw inmate Ted Bennett drinking wine and demanded he be given some. Bennett refused and Brown said he was going to cut Bennett. Bennett punched Brown in the face, knocking Brown out, thereafter, inmates Courtland Pitts and Clarence Wells going after Bennett. At this time, Robert Wilson and Robert Folks got up and went to Bennett's aide with others in the dorm going to the aide of Pitts and Wells. What resulted was a major fighting incident with blacks against whites, and the entire dormitory becomming involved in throwing things and fighting. Approximately fourty (40) of the men housed in the dormitory area were involved in the incident with the main instigators being Courtland Pitts, Clarence Wells, Robert Wilson, and Robert Folks. As indicated earlier, the first fight was between inmate Ted Bennett and Cecil Brown. In the insueing fighting, Robert Wilson was hit in the head with a lock connected to a belt which inmate Clarence Wells was

---

**2.** Rule 31 of the Rules for Treatment of Inmates in the Delaware Correctional Institutions states, in part:

> (1) When faced with an immediate threat to the security or safety of the institution or any of its employees or inmates, officials of the institution may temporarily reassign, segregate or sequester inmates.

**3.** Williams' judgment was exercised quickly and under stress, and, accordingly, deserves

substantial deference. As this Court has recently observed:

> [I]t is the kind of judgment which prison officials have the broadest judgment to make and which courts will question only when there is patent abuse.

*Davis v. Young, et al.*, C.A. 76–349 (D.Del. Sept. 28, 1977), n. at 5. *See also United States ex rel. Arzonica v. Scheipe*, 474 F.2d 720, 722 (3d Cir. 1973).

swinging. Inmate Harold Plass was beat up indirectly in the fighting and his attitude with both Captain Tucker and Williams was to get himself out of the dormitory area as he believed he was in further danger of injury. Melvin Pusey and his part in the incident has allready been covered.

The major cause of the incident was the presence of wine in the unit and of this, inmate Charles Forrest had ten (10) gallons. Inmate Robert Wilson and Ted Bennett had five (5) gallons, and additional wine was also noted. The heat and the tension in the building were also a factor in the incident but the major causes were the wine and the racial differences.

(Px–2). While the report refers to the fact that certain "recorded statements" had not yet been transcribed, there is no evidence which suggests that any further investigation was conducted after August 9, 1979.[4]

Pitts remained in isolation from August 2nd to August 15th when he was given what Captain Kee described as a "hearing" before an Adjustment Board consisting of Kee and two others from the D.C.C. staff. The purpose of the hearing, according to Kee, was to inform Pitts why he had been kept in solitary confinement and to determine whether his segregation from other inmates should cease. By the time of this "hearing", however, the Institutional Classification Committee had already decided that Pitts should be returned to Medium Security. The record of the hearing recites that "Mr. Pitts was transferred ... to Maximum Security under Rule 31 for inciting to riot", but that "the Rule # 31 has been withdrawn and Mr. Pitts has been reclassified to Medium I by the ICC Board." In the space reserved for "findings" of the Adjustment Board, the following appears:

4. In fact, Kee expressly testified that the investigation concluded with the filing of his report on August 9.

5. The standard conditions of solitary confinement at D.C.C. are described in *Johnson v. Anderson*, 370 F.Supp. 1373 (D.Del.1974).

6. Rule 29(4) provides:

No further action has been taken other than to keep the matter under investigation. Until such time as further information is developed and/or the incident is disposed of in other ways, Mr. Pitts will remain in population and the Rule # 31 is now withdrawn. Mr. Pitts has been reclassified as noted.

Both sides agree that the question of Pitts' role in the August 2nd incident was not addressed at the August 15th "hearing" and that Pitts was not asked for his version of what happened on that date. At the hearing, Pitts insisted that he should at least have been interviewed about the incident in the course of the investigation and demanded to see any reports of the incident which were being relied upon by the administration. Pitts was not given the opportunity to inspect the evidence against him or to comment upon it, and as a result of his protests, was written up by Lt. William Hoosier for showing "disrespect" to the Board.

During Pitts' thirteen days in the isolation section of the prison, he was held under the same conditions of solitary confinement as inmates who have been sentenced there for violations of the institution's disciplinary rules. In addition to the usual deprivations of "solitary" (e. g. twenty-four hour confinement to cell, no human contact, no radio, TV, or reading other than religious materials, and no other privileges),[5] Pitts was allowed no toilet articles for the first twenty-four hours and the only available light throughout his stay was the daylight which filtered through the heavily screened cell window during the day. If Pitts had been sentenced to solitary confinement for a "major violation" of the institution's disciplinary rules, the sentence under those rules could not have exceeded fifteen days.[6]

29. *Punishment.*
\* \* \* \* \* \*
(4) Punishment for major violations shall be any one or more of the following:
(a) Those penalties designated for minor violations;
(b) Loss of good time not to exceed thirty days; provided, however, that such good time may be restored at any time by the

The plaintiff's principal claim is that the Fourteenth Amendment guaranteed him a meaningful opportunity to respond to the charges against him. The law upon which he relies has been well settled for many years. Over seven years ago, the governing rules were summarized by this Court in *Johnson v. Anderson*, 370 F.Supp. 1373 (D.Del.1974). It is apparent that they need to be repeated:

It is well established in this circuit as elsewhere that a citizen does not shed all of his constitutional rights at the prison gate. To determine what rights survive incarceration and how those rights have been properly affected by the state's legitimate interests in security and rehabilitation within its penal institutions involves a weighing and balancing of conflicting interests. *Gittlemacker v. Prasse*, 428 F.2d 1 (3d Cir. 1970).

In striking this constitutional balance here, we are aided by several established propositions.

First, absent an unusual circumstance, the Due Process Clause requires that, prior to the imposition of solitary confinement, an inmate must at least be given notice of the charge against him and an opportunity to tell his side of the story. *Gray v. Creamer*, 465 F.2d 179 (3d Cir. 1972); *United States ex rel. Tyrrell v. Speaker*, 471 F.2d 1197 (3d Cir. 1973); *Biagiarelli v. Sielaff*, 483 F.2d 508 (3d Cir. 1973); *Braxton v. Carlson*, 483 F.2d 933 (3d Cir. 1973); *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971); *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971).[7]

Second, the cases are unanimous in holding that the state's legitimate interest in the security of its penal institutions is sufficiently compelling that an inmate may, consistent with due process of law, be transferred to solitary confinement summarily whenever the security of the institution so requires. See e. g., *Gray v. Creamer*, supra at n. 6; *United States ex rel. Arzonica v. Scheipe*, 474 F.2d 720 (3rd Cir. 1973); *Biagiarelli v. Sielaff*, supra; *Braxton v. Carlson*, supra.

Third, the existence of exigent circumstances which permit the state to summarily subject an inmate to the added privations of solitary confinement does not relieve the state of the responsibility of providing at a later time the procedures that the Constitution would otherwise require prior to the imposition of the new status. Said more simply, when the reason for the emergency exception to the hearing requirement is no longer apposite, the exception is no longer apposite. If, after the emergency which gave rise to the inmate's reassignment passes, the inmate is to be kept in his new status, notice of charges and an opportunity to respond are required. *Urbano v. McCorkle*, 334 F.Supp. 161 (D.N.J.1971).[8] The test of when this right arises is one of reasonableness under all the circumstances of the case. *Braxton v. Carlson*, 484 F.2d 933 (3rd Cir. 1973).

*Johnson v. Anderson*, 370 F.Supp. at 1379–80.

In this case, it is conceded that Captain Kee afforded Pitts no opportunity to rebut the charges for which he was confined in isolation. Nor has it been contended that the emergency situation which was the precipitating cause of plaintiff's transfer continued for any substantial time following Pitts' confinement.[9] Instead, the defense

---

Administration in accordance with the laws of Delaware;

(c) Administrative isolation not to exceed fifteen days which may, at the Board's discretion, be served in shorter periods;

(d) Loss of visiting privileges not to exceed thirty days.

**7.** *Accord, Hughes v. Rowe*, —— U.S. ——, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**8.** *See also Biagiarelli v. Sielaff*, supra, 483 F.2d at 512; *La Grande v. Redman*, 432 F.Supp. 1307, 1309 (D.Del.1977).

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914).

**9.** Officer DiVirgilis testified that the Dorm returned to normal within a couple of days, or at least by the end of the investigation. Captain Kee's own investigative report confirms this,

offered three purported excuses for failing to provide the procedural safeguards required by the Due Process Clause. None is sufficient. Moreover, any prison official who was reasonably conscientious about ascertaining and fulfilling his or her responsibilities under the Constitution would know that each of those excuses was insufficient.

■ First, it is suggested that the investigation required by the August 2nd incident warranted a delay of thirteen days in the holding of a hearing. As earlier observed, however, Kee's report was available on August 9th and there is no evidence that any further investigation was conducted thereafter.[10] Moreover, this is not a case of a thirteen day delay before a due process hearing; a meaningful hearing was *never* held.

Second, it is said that no opportunity to be heard was necessary because Pitts was not "formally charged" with an infraction of institution rules and was placed in solitary as a security measure, not as a punitive one. This argument is very reminiscent of the *Johnson* case and the answers must, of course, be the same. The following observations of the Court are equally appropriate here:

> Initially, the defendants say that the plaintiffs were placed in isolation for security reasons and not as a punitive measure and that, therefore, no requirement for a fair procedure arose. This argument is neither factually nor legally sound. While security considerations undoubtedly played a part in [the defendant's] ... decision, I conclude from the evidence that he became convinced of the plaintiffs' participation [in] the assault and determined that isolation would be the appropriate administrative response....[11]

> \*     \*     \*     \*     \*     \*

Moreover, even if the imposition of solitary confinement had not been intended in part as punishment, this would not dispel the due process problem. The Due Process Clause requires fundamental fairness whenever there may be a substantial deprivation, regardless of the label used to characterize the contemplated action. It requires no great insight to appreciate that the "grievous loss", *Joint Anti-Facist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951), suffered by an inmate upon his confinement in isolation is felt by him to be no less grievous when he is told that he is not being punished. Reasons of security or other legitimate penal interests may justify restrictive confinement or other sanctions, but where the sanction imposes a substantial deprivation upon an inmate, it may not, absent unusual circumstances, be imposed without affording the inmate a fair opportunity to rebut the factual basis of the decision to change his status.... While the information available to the ... [defendant] may have been compelling, he nevertheless engaged in a process of attempting to reconstruct a historical event which he did not witness; the possibility of a factual error is always present in such an enterprise. The procedural safeguards required by the Constitution cannot be dispensed with solely because the risk of error in a particular situation may seem slight to the official responsible for handling it.

*Johnson v. Anderson*, 370 F.Supp. at 1380–81.

Captain Kee's final argument is a variation of the one just considered. He asserts that Pitts was retained in isolation because there was no other cell available in which he could be safely housed. I am not persuaded that this was in fact true during the

---

stating on August 9 that "it does seem to be much quieter now." (PX–2).

**10.** A pending investigation may legitimately delay the holding of a due process hearing, *Hughes v. Rowe*, —— U.S. ——, ——–——, 101 S.Ct. 173, 174–179, 66 L.Ed.2d 163 (1980), and I cannot say on these facts that the seven-

day investigative delay was unreasonable. However, defendant still leaves unanswered the delay from August 9 to the 15th.

**11.** Here, as in the *Johnson* case, the plaintiff was not merely transferred to more secure quarters, he was held under conditions regularly prescribed as punishment for misbehavior.

relevant period [12] but again, as spelled out in the *Johnson* case, the argument is simply beside the point:

> The second and associated reason offered by ... [defendant] in support of the reasonability of his action is that, at the time of the attack, no facility other than isolation was available where these inmates could be housed with safety....

It exhibits no lack of appreciation for the dangerous situation existing in the prison on May 7, 1973 to say that this argument misses the point. There is nothing in the Constitution which prevents ... inmates from being held in solitary confinement whenever security or some other legitimate interest of the state so requires. What is required is that the inmates subjected to solitary confinement be given fair notice of their offense and a chance to respond.... To say that there was no need for a hearing because there was in any case no adequate place to which to transfer the plaintiffs assumes that which the hearing requirement is meant to fairly determine: whether each of these plaintiffs participated in the attack.... If each had, the Constitution would not require their removal from isolation; if one of them had not, there was no need to subject him to the more restrictive confinement of isolation.

*Id.*, 370 F.Supp. at 1381–82.

I conclude that Courtland Pitts was kept in solitary confinement in violation of his right to procedural due process from August 9 to August 15, 1979. Before turning to the subject of relief, I will address the remaining liability issue, that arising under the Eighth Amendment.

■ The cases applying the Cruel and Unusual Punishment Clause in the context of solitary confinement were reviewed in the *Johnson* case. 370 F.Supp. at 1385–89.

The cases which have been decided since then are consistent with the principles there described. Suffice it to say that the conditions to which Pitts was subjected, particularly when considered in the light of the limited time they were endured, did not rise to the level of an Eighth Amendment violation.

Turning to the relief to be granted as a result of the violation of plaintiffs' Fourteenth Amendment rights, it is clear that he is entitled, at a minimum, to an injunction barring similar violations of his rights in the future.

■ Plaintiffs' prayer for damages raises a number of additional issues.[13] The first is one of proximate cause. The Supreme Court has held that a distinction must be drawn "between a result caused by a constitutional violation and one not so caused." *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). Accordingly, when it is found that a defendant has deprived the plaintiff of a hearing on a particular matter in violation of the Due Process Clause, the Court must go on to consider whether the defendant has shown by a preponderance of the evidence that the result would have been the same if an appropriate hearing had been held. If so, there can only be an award of nominal damages. *Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1977); *Thompson v. Burke*, 556 F.2d 231, 240 (3d Cir. 1977).

■ It is apparent from the foregoing facts that Pitts would have remained in solitary confinement until August 9th even if everyone had lived up to their responsibilities under the Constitution. The relevant questions, accordingly, are whether Pitts would have been found guilty at a hearing on August 9th and, if so, whether he would

---

**12.** If the placement of the plaintiff in solitary was occasioned solely by a lack of other "secured" housing or for Pitts' security, then Pitts should have been allowed to retain the bulk of his privileges; he was not.

**13.** One issue which is *not* raised is that of official immunity. Captain Kee affirmatively denied reliance upon it at trial. As earlier noted, Captain Kee could not successfully maintain that a reasonable person in his position could have failed to realize he was violating Pitts' constitutional rights.

have been sentenced to more than seven days already served in solitary confinement.[14] The first question is easily resolved; evidence relevant to the second is almost non-existent.

After reviewing the Kee report, which would have been before the Adjustment Board, and listening to Pitts' account at trial of the August 2nd incident, it is apparent to me that an impartial[15] Adjustment Board would have found that Pitts was a substantial factor in escalating a two man fight into a race riot. While this is the kind of activity which well might justify a sentence to isolation in excess of seven days, the record suggests that the August 2nd incident was not considered at the time to be as serious a matter as one might otherwise have expected. I say this not only because Pitts was released from isolation two days before the fifteen day limit, but also because none of the inmates who played a role in creating the incident, other than Pitts and Wells,[16] served any time at all in isolation. In light of this suggestion and in the absence of any evidence of sentences imposed by the Adjustment Board against others in the wake of similar episodes, I find that Captain Kee has failed to carry his burden of showing that Pitts would have suffered thirteen days of solitary confinement had a hearing been given.

It follows that Pitts is entitled to compensatory damages for being wrongfully confined in isolation for the six day period between August 9th and August 15th. While it is, of course, difficult to put a

value on being subjected to the conditions of solitary confinement, some estimate has to be made. I assess damages in the amount of $30 per day. This is in keeping with the estimates made by other judges and juries in similar contexts. *See, e. g., Sostre v. Rockefeller, supra; Taylor v. Clement*, 433 F.Supp. 585, 589 (S.D.N.Y. 1977); *Mack v. Johnson*, 430 F.Supp. 1139, 1150–51 (E.D.Pa.1977); *U. S. ex rel. Neal v. Wolfe*, 346 F.Supp. 569, 576 (E.D.Pa.1972). *See also, Larkins v. Oswald*, 510 F.2d 583 (2d Cir. 1975) (jury verdict of $1,000 for 12 days of solitary).

The most difficult question in this case is presented by the plaintiff's prayers for punitive damages. The purpose of punitive damages is not only to punish behavior which is contrary to the public interest but also to deter others who may contemplate similar conduct in the future. *Davidson v. Dixon*, 386 F.Supp. 482 (D.Del.1974). I conclude such damages are appropriate in this case.

I believe that Captain Kee was aware of Pitts' right to give his version of the August 2nd incident, but that having made up his own mind about Pitts' guilt, decided that he was not worthy of a hearing.[17] His attitude was rather strikingly revealed in an exchange at trial. When Pitts, acting *pro se*, asked why Kee had not felt it necessary to hear his side of the case, Kee responded that it was because Pitts was a "trouble maker" and "harassed" Kee's guards. One can readily understand how

---

14. "The reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the confinement." *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975). *Accord, United States ex rel. Bennett v. Prasse*, 408 F.Supp. 988, 999 (E.D.Pa.1976); *Tyrrel v. Taylor*, 394 F.Supp. 9 (E.D.Pa.1975).

15. Since Captain Kee conducted the investigation, a properly constituted Adjustment Board would not have had him among its members. *See, e. g., Meyers v. Alldredge*, 492 F.2d 296, 306 (3d Cir. 1974) (prohibiting the investigative officers from sitting on the disciplinary body); *Braxton v. Carlson, supra*, 483 F.2d at 941; *United States ex rel. Neal v. Wolfe*, 346 F.Supp. 569, 574–75 (E.D.Pa.1972).

16. According to Kee's investigative report, two other named "instigators" were removed from the dorm after the riot to the institution's hospital; they remained there awaiting a decision regarding transfer back to C Dorm on August 9.

My notes do not reveal how long Wells remained in isolation.

17. "Plaintiffs' misconduct after their transfer does not absolve defendants of their duty to afford them a hearing on the ground that the result would be a foregone conclusion." *Carlo v. Gunter*, 520 F.2d 1293, 1297 (1st Cir. 1975).

the emotions which prompted his response came to exist. It is clear from Pitts' conduct while Williams was trying to restore order in the dorm, as well as from other evidence in the case, that Pitts feels compelled to challenge and defy authority and, accordingly, that he is a difficult inmate to supervise. This fact, however, does not justify Kee's deliberate violation of the Due Process Clause.

Disrespectful prisoners are a fact of prison life. The temptation to respond to disrespect in kind is also a fact of prison life. The public has a compelling interest, however, in seeing that its corrections officers do not yield to this temptation. When an officer commits an inmate to solitary confinement he exercises the power of the State and it is of crucial importance that such power not be arbitrarily exercised. As the law has long recognized and as this case forcefully demonstrates, the arbitrary exercise of official power inevitably breeds disrespect for lawful authority and disobedience to its commands. For this reason, the arbitrary exercise of power in the context of prison life is particularly counterproductive.

Seven years ago, this Court, following a long line of precedents, held in very similar circumstances that prison officials must employ some rational process for ascertaining the facts before they can punish inmates with solitary confinement. Captain Kee saw fit to ignore that constitutional responsibility. Hopefully, the award of punitive damages in this case will help insure that the constitutional responsibilities of the prison staff will be taken more seriously in the future. The judgment in plaintiff's favor will include a punitive damage award of $500.